**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-01829-NRN

THE UNITED STATES OF AMERICA,

       and

THE STATE OF COLORADO,

               Plaintiffs,

    v.

DCP OPERATING COMPANY, LP;
DCP MIDSTREAM HOLDING, LLC;
DCP LP HOLDINGS, LLC;
DCP PARTNERS COLORADO LLC;
DCP ASSETS HOLDING, LP;
DCP LUCERNE 2 PLANT LLC,

          Defendants.

---

**CONSENT DECREE**

---

# TABLE OF CONTENTS

I.      JURISDICTION AND VENUE ........................................................................................3

II.     APPLICABILITY .........................................................................................................4

III.    DEFINITIONS..............................................................................................................6

IV.     CIVIL PENALTY .......................................................................................................14

V.      COMPLIANCE REQUIREMENTS...................................................................................16

VI.     INCORPORATION OF CONSENT DECREE REQUIREMENTS INTO FEDERALLY

ENFORCEABLE PERMITS ...................................................................................................47

VII.    ENVIRONMENTAL MITIGATION PROJECT .................................................................48

VIII.   REPORTING REQUIREMENTS ...................................................................................49

IX.     STIPULATED PENALTIES ..........................................................................................58

X.      FORCE MAJEURE .....................................................................................................70

XI.     DISPUTE RESOLUTION .............................................................................................72

XII.    INFORMATION COLLECTION AND RETENTION .........................................................74

XIII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS.................................................76

XIV.    COSTS ....................................................................................................................79

XV.     NOTICES..................................................................................................................79

XVI.    EFFECTIVE DATE.....................................................................................................81

XVII.   RETENTION OF JURISDICTION ..................................................................................81

XVIII.  MODIFICATION ........................................................................................................81

XIX.    TERMINATION..........................................................................................................82

XX.     PUBLIC PARTICIPATION ...........................................................................................84

XXI.    SIGNATORIES/SERVICE.............................................................................................84

XXII.   INTEGRATION ..........................................................................................................84

XXIII.  26 U.S.C. SECTION 162(F)(2)(A)(II) IDENTIFICATION ................................................85

XXIV.   FINAL JUDGMENT ....................................................................................................85

APPENDIX A ....................................................................................................................92

i

WHEREAS, Plaintiffs United States of America ("United States"), on behalf of the United States Environmental Protection Agency ("EPA"), and the State of Colorado (the "State"), on behalf of the Colorado Department of Public Health and Environment ("CDPHE"), have filed a complaint in this action concurrently with this Consent Decree alleging that Defendants, DCP Operating Company, LP, DCP Midstream Holding, LLC, DCP LP Holdings, LLC, DCP Partners Colorado LLC, DCP Assets Holding, LP, and DCP Lucerne 2 Plant LLC (collectively "DCP") violated Section 111 of the Clean Air Act ("CAA"), 42 U.S.C. § 7411, and Colorado Regulation 6, Part A, 5 Colo. Code Regs. § 1001-8:A.

WHEREAS, the Complaint reflects the outcome of an investigation conducted by EPA and the issuance of a Notice of Violation by EPA to DCP on March 11, 2019 ("NOV"), pertaining to the Greeley, Kersey/Mewbourn, Roggen, and Platteville Natural Gas Processing Plants in Weld County, Colorado and the Ladder to Creek Gas Processing Plant in Cheyenne County, Colorado (which DCP divested to an unrelated third party in December 2019).

WHEREAS, the leak detection and repair ("LDAR") regulations implement the New Source Performance Standards ("NSPS") of Section 111 of the CAA, and include 40 C.F.R. Part 60, Subpart KKK (Standards of Performance for Equipment Leaks of Volatile Organic Compounds From Onshore Natural Gas Processing Plants for which Construction, Reconstruction, or Modification commenced after January 20, 1984, and on or before August 23, 2011) ("Subpart KKK"); 40 C.F.R. Part 60, Subpart OOOO (Standards of Performance for Crude Oil and Natural Gas Production, Transmission and Distribution for which Construction, Modification or Reconstruction Commenced After August 23, 2011, and on or before September 18, 2015) ("Subpart OOOO"). State LDAR regulations include Colorado Regulation 6, Part A, 5 Colo. Code Regs. § 1001-8:A.

WHEREAS, DCP does not admit any liability to the United States or the State arising out of the transactions or occurrences alleged at any of the gas plants listed in the Complaint; the Notice of Violation issued by the EPA to DCP on March 11, 2019 concerning the Greeley, Roggen, Kersey/Mewbourn, Platteville, and Ladder Creek Natural Gas Processing Plants; and LDAR claims in the State Compliance Advisories Nos. 2020-089 (April 27, 2020) (Violation C), 2020-047 (April 20, 2020) (Violation A), 2020-155 (July 2, 2020) (Violations A.i. and A.ii), 2022-001 (January 6, 2022) (Violation B), and Notices of Violation Nos. 2020-160 (July 13, 2020) (Violations A.i., A.,ii., B.i., B.ii., and C), 2021-034 (April 21, 2021) (Violations A, B, and C), Inspection Report Source Number 0107 (November 19, 2021) (Inspection Summary and Conclusion A), Inspection Report Source Number 0049 (October 24, 2021) (Inspection Summary and Conclusion A), and Inspection Report Source Number 0015 (August 19, 2021) (Inspection Summary and Conclusion A).

WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.     JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and Section 113(b) of the CAA, 42 U.S.C. § 7413(b). Venue lies in this District pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and (c), and 1395(a), because the violations alleged in the Complaint are alleged to

3

have occurred, and DCP conducts business, in this judicial district. DCP consents to and shall not challenge entry of this Consent Decree or this Court's jurisdiction to enter and enforce this Decree, and further consents to venue in this judicial district.

2.      For purposes of this Consent Decree, DCP agrees that the Complaint states claims upon which relief may be granted.

## II.      APPLICABILITY

3.      The obligations of this Consent Decree apply to and are binding upon the United States and the State, and upon DCP and any of its successors, assigns, or other entities or persons otherwise bound by law.

4.      During the term of this Consent Decree, in the event that DCP proposes to sell or transfer ownership or operation, in whole or in part, of any of the Covered Facilities (except Ladder Creek) to an entity unrelated to DCP ("Third Party"), DCP shall notify the Third Party in writing of the existence of this Consent Decree prior to the closing of such sale or transfer and DCP shall provide a copy of this Consent Decree to the Third Party. DCP shall send a copy of the written notice to the Third Party to the EPA, the United States, the State, and CDPHE, in accordance with Section XV (Notices) at least 60 Days before the proposed closing.

5.      No sale or transfer, whether in whole or in part, of ownership or operation of any of the Covered Facilities shall take place unless DCP demonstrates the acquiring Third Party has the financial and technical ability to comply and has agreed to enter a modification to this Consent Decree indicating the Third Party will become a party to this Consent Decree. In this event DCP will present to the United States and the State a motion to modify this Consent Decree that DCP will file with the Court to make the terms and conditions of this Consent Decree applicable to the Third Party. It is the intent of the Parties that, upon approval of the

Court, the modification shall release DCP from the requirements of this Consent Decree and

make the Third Party liable for all requirements and liabilities applicable to the transferred or

purchased Covered Facility (or Covered Facilities), including stipulated penalties or other relief

for noncompliance arising prior to the date of transfer, regardless of when that noncompliance

was identified.  DCP may not assign, and may not be released from, any obligation under this

Consent Decree that is not specific to the purchased or transferred Covered Facility.

6.     This Consent Decree shall not be construed to impede the sale or transfer of any

asset or interest between DCP and any Third Party so long as the requirements of this Consent

Decree are met.

7.     Paragraphs 4–6 shall not be construed to affect or apply to mergers or other

corporate transactions in which DCP is acquired by a Third Party and the surviving entity, by

operation of law, assumes all of such Defendant's assets and liabilities pursuant to the Consent

Decree relating to the Covered Facilities.

8.     DCP shall: (a) provide a copy of this Consent Decree to all officers of DCP and

managers who will be responsible for implementation of the terms of this Consent Decree, and

ensure that employees and contractors whose duties might reasonably include compliance with

any provision of this Consent Decree are made aware of any provision of this Consent Decree

that falls within such person's duties; and (b) place an electronic version of the Consent Decree

on its internal environmental website. DCP shall be responsible for ensuring that all employees

and contractors involved in performing any work pursuant to this Consent Decree perform such

work in compliance with the requirements of this Consent Decree.

9.     In any action to enforce this Consent Decree, DCP shall not raise as a defense the

failure by any of its officers, directors, employees, agents, or contractors to take any actions

necessary to comply with the provisions of this Consent Decree.  This Section does not preclude DCP from holding any employee, agent, or contractor who is alleged to have not complied with this Consent Decree liable for their actions.

### III.    DEFINITIONS

10.    Terms used in this Consent Decree that are defined in the CAA or in federal and state regulations promulgated pursuant to the CAA shall have the meaning assigned to them in the CAA or such regulations, unless otherwise provided in this Decree.  In the case of a conflict between federal and state definitions, federal definitions shall control.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.    "Affected Facility" shall include any apparatus at a Covered Facility that meets one of the types constituting an "affected facility" in 40 C.F.R. § 60.5365a(b) through (h), regardless of the apparatus' actual date of construction, modification, or reconstruction.

b.    "Annual" or "annually" shall mean a calendar year, except as otherwise provided in applicable LDAR regulations.

c.    "CAP" shall mean the Corrective Action Plan described in Paragraph 31 of this Consent Decree.

d.    "CDPHE" shall mean the Colorado Department of Public Health and Environment.

e.    "Clean Air Act" or "Act" or "CAA" shall mean the federal Clean Air Act, 42 U.S.C. §§ 7401-7671q, and its implementing regulations.

f.    "Complaint" shall mean the Complaint filed by the United States and Colorado in this action.

g.    "Consent Decree" or "Decree" shall mean this Consent Decree and the

appendix attached hereto.

h.      "Control Valve" shall mean a device capable of modulating fluid flow in response to a signal from an external device to keep a regulated process variable as close as possible to the desired set point.

i.      "Covered Equipment" shall mean the following equipment in all Covered Process Units: All valves, pumps, and connectors in VOC or wet gas service that are subject to regulation under LDAR provisions in 40 C.F.R. Part 60, Subparts KKK, OOOO, OOOOa (and by reference 40 C.F.R. Part 60, Subparts VV and VVa), or any applicable State equipment Leak regulation.

j.      "Covered Facilities" shall mean the following natural gas processing plants owned and operated by DCP in Weld County, Colorado:  Greeley (AIRS ID 123-0099), Roggen (AIRS ID 123-0049), Kersey/Mewbourn (AIRS ID 123-0090), Platteville (AIRS ID 123-0595), Spindle (AIRS ID 123-0015), Lucerne (AIRS ID 123-0107), O'Connor (AIRS ID 123-9012) and Bighorn (AIRS ID 123-9FBB).

k.      "Covered Process Unit" shall mean any process unit that is, or under the terms of this Consent Decree becomes, subject to the equipment Leak provisions of 40 C.F.R. Part 60, Subpart OOOOa (and by reference 40 C.F.R. Part 60, Subpart VVa).

l.      "Date of Lodging" shall mean the date that the United States and the State file a "Notice of Lodging" of this Consent Decree with the Clerk of this Court for the purpose of providing notice and comment to the public.

m.      "Day," for purposes of requirements uniquely imposed by the LDAR Program under this Consent Decree, and not by any applicable LDAR Regulations, shall mean a calendar day.  In computing any period of time under this Consent Decree for submittal of

reports or Approval of Deliverables (Paragraph 46), where the last Day would fall on a Saturday,

Sunday, or federal or state holiday, the period shall run until 11:59 p.m. Mountain Time of the

next business day.  For all other purposes, "Day" shall have the meaning provided in the

applicable LDAR Regulations.

n.      "DOR" shall mean Delay of Repair.

o.      "Effective Date" shall have the meaning given in Section XVI (Effective

Date).

p.      "Environmental Mitigation Projects" shall mean the requirements in

Paragraph 33 for implementation of an Optical Gas Imaging Program and the requirements in

Section VII for implementation of an emissions reduction project to mitigate environmental harm

allegedly caused by noncompliance at the Covered facilities.

q.      "EPA" shall mean the United States Environmental Protection Agency

and any of its successor departments or agencies.

r.      "Existing Connectors" shall mean connectors that are installed in a

Covered Process Unit prior to the Effective Date.

s.      "Existing Valves" shall mean valves that are installed in a Covered

Process Unit prior to the Effective Date.

t.      "Fin Fan Unit" shall mean an air-cooled heat exchanger equipped with

threaded end-plugs.

u.      "LDAR" or "Leak Detection and Repair" shall mean the Leak detection

and repair activities required by any applicable "equipment leak" regulations set forth in

40 C.F.R. Part 60, Subparts KKK, OOOO, OOOOa (and by reference 40 C.F.R. Part 60,

Subparts VV and VVa). LDAR also shall mean any applicable equipment Leak regulations of

8

the State that require (1) the use of Method 21 to monitor for equipment Leaks and (2) the repair of Leaks discovered through such monitoring.

      v.     "LDAR Audit Commencement Date" or "Commencement of an LDAR Audit" shall mean the first Day of the on-site inspection that accompanies an LDAR Audit.

      w.     "LDAR Audit Completion Date" or "Completion of an LDAR Audit" shall mean 120 Days after the LDAR Audit Commencement Date.

      x.     "LDAR Auditor" shall mean the person or entity selected pursuant to Paragraph 30.b and responsible for conducting any LDAR Audit and preparing any Audit Report required under Paragraph 30 (LDAR Audits).

      y.     "LDAR Database" shall mean an electronic database used to record data generated for compliance with LDAR Regulations and that is capable of exporting data in a reasonably usable format.

      z.     "LDAR Personnel" shall mean all DCP's contractors and employees who perform any of the following activities at a Covered Facility: LDAR monitoring; LDAR data input; maintenance of LDAR monitoring devices; leak repairs on equipment subject to LDAR; and/or any other field duties generated by LDAR Regulations or the LDAR Program. LDAR Personnel does not include the LDAR Auditor.

      aa.     "LDAR Program" shall mean the Leak Detection and Repair Program specified in Section V.B of this Consent Decree, which includes:

          (i)     Requirements to achieve and ensure compliance with the LDAR requirements for natural gas processing plants at 40 C.F.R. Part 60, Subparts KKK, OOOO, and OOOOa (and by reference 40 C.F.R. Part 60, Subparts VV and VVa), as well as any applicable equipment leak requirements of the State; and

9

(ii)     Required measures to mitigate environmental harm caused by alleged noncompliance at the Covered Facilities (including drill and tap requirements in Paragraph 23, the valve replacement and improvement program in Paragraph 25, and the connector replacement and improvement program in Paragraph 26);

bb.     "LDAR Regulations" shall collectively mean the regulations, and requirements referenced in Paragraph 10.aa(i) as well as any permits incorporating such requirements.

cc.     "Leak" shall mean:

(i)     A Screening Value at or above the leak definition in the applicable LDAR Regulations, and as set forth in Table 1 of this Consent Decree;

(ii)     Any emissions detected through olfactory, visual, or auditory sensing; or

(iii)     Any emissions imaged by an OGI instrument.

dd.     "Low-Emissions Packing" or "Low-E Packing" shall mean a valve packing product that meets the specifications set forth in subparagraphs (i) or (ii) below. "Low-E Injectable Packing" is a type of Low-E Packing product (also meeting the specifications in subparagraphs (i) or (ii) below) that can be injected into a valve during a "drill-and-tap" repair of the valve as described in Paragraph 23.e of this Consent Decree.

(i)     A valve packing product, independent of any specific valve, for which the manufacturer has issued a written warranty that the packing will not emit fugitives at greater than 100 parts per million (ppm), and that, if it does emit at greater than 100 ppm at any time in the first five years after installation, the

manufacturer will replace the product; provided, however, that no packing product shall qualify as "Low-E" by reason of written warranty unless the packing first was tested by the manufacturer or a qualified testing firm pursuant to generally-accepted good engineering practices for testing fugitive emissions; or

(ii)     A valve packing product, independent of any specific valve, that has been tested by the manufacturer or a qualified testing firm pursuant to generally-accepted good engineering practices for testing fugitive emissions, and that, during the test, at no time leaked at greater than 500 ppm, and on average, leaked at less than 100 ppm.

ee.     "Low-Emissions Valve" or "Low-E Valve" shall mean either of the following:

(i)     A valve (including its specific packing assembly or stem sealing component) for which the manufacturer has issued a written warranty that it will not emit fugitives at greater than 100 ppm, and that, if it does emit at greater than 100 ppm at any time in the first five years after installation, the manufacturer will replace the valve; provided, however, that no valve shall qualify as "Low-E" by reason of written warranty unless the valve (including its specific packing assembly) either: (a) first was tested by the manufacturer or a qualified testing firm pursuant to generally-accepted good engineering practices for testing fugitive emissions; or (b) is an "extension" of another valve that qualified as "Low-E" under this subparagraph; or

(ii)     A valve (including its specific packing assembly) that: (a) has been tested by the manufacturer or a qualified testing firm pursuant to generally-

accepted good engineering practices for testing fugitive emissions and that, during

the test, at no time leaked at greater than 500 ppm, and on average, leaked at less

than 100 ppm; or (b) is an "extension" of another valve that qualified as "Low-E"

under this subparagraph.

For purposes of Paragraph 10.ee, being an "extension of another valve" means that the

characteristics of the valve that affect sealing performance (e.g., type of valve, stem motion,

tolerances, surface finishes, loading arrangement, and stem and body seal material, design, and

construction) are the same or essentially equivalent as between the tested and the untested valve.

ff.     "Method 21" shall mean the test method found at 40 C.F.R. Part 60,

Appendix A-7, Method 21.  To the extent that the Covered Equipment is subject to regulations

that modify Method 21, those modifications shall be applicable.

gg.     "Monthly" shall mean a calendar month (e.g., January 1 through January

31), except as otherwise provided in applicable LDAR Regulations.

hh.     "Optical Gas Imaging" or "OGI" shall mean monitoring using an

instrument that images a gas cloud, not visible to the naked eye, and can absorb/emit radiant

energy at the waveband of the infrared camera.  The waveband must contain at least the range of

3.2 to 3.4 micrometers.

ii.     "Paragraph" shall mean a portion of this Consent Decree identified by an

Arabic numeral.

jj.     "Parties" shall mean the United States, the State, and DCP.

kk.     "Process unit" shall mean "components [equipment] assembled for the

extraction of natural gas liquids from field gas, the fractionation of the liquids into natural gas

products, or other operations associated with the processing of natural gas products.  A process

unit can operate independently if supplied with sufficient feed or raw materials and sufficient storage facilities for the products." 40 C.F.R. § 60.5430a.

ll.    "Process Unit Shutdown" means a work practice or operational procedure that stops production from a Covered Process unit or part of a Covered Process Unit during which it is technically feasible to clear process material from a Covered Process Unit or part of a Covered Process Unit consistent with safety constraints and during which repairs can be accomplished.  The following are not considered Process Unit Shutdowns:  (a) an unscheduled work practice or operational procedure that stops production from a Covered Process Unit or part of a Covered Process Unit for less than 24 hours; (b) an unscheduled work practice or operational procedure that would stop production from a Covered Process Unit or part of a Covered Process Unit for a shorter period of time than would be required to clear the Covered Process Unit or part of the Covered Process Unit of materials and start up the unit, and would result in greater emissions than delay of repair of Leaking components until the next scheduled Process Unit Shutdown; and (c) the use of spare equipment and technically feasible bypassing of equipment without stopping production.

mm.    "Project Dollars" shall mean DCP's direct costs incurred in implementing the Environmental Mitigation Project identified in Section VII to the extent that such costs both: (i) comply with the requirements set forth in Section VII; and (ii) constitute DCP's direct payments for such projects or DCP's external costs for contractors, vendors, and equipment. Project Dollars shall not include DCP's internal personnel costs incurred in overseeing implementation of the Environmental Mitigation Project identified in Section VII.

nn.    "Quarter" or "quarterly" shall mean a calendar quarter (January through March, April through June, July through September, October through December) except as

otherwise provided in applicable LDAR Regulations.

oo. "Repair Verification Monitoring" shall mean monitoring in order to determine whether the Screening Value is below the applicable leak definition in the LDAR Regulations or LDAR Program or that the Leak has been eliminated.

pp. "Screening Value" shall mean the highest emission level that is recorded at Covered Equipment as it is monitored for the relevant monitoring event in accordance with Method 21.

qq. "Section" shall mean a portion of this Consent Decree identified by a Roman numeral.

rr. "State" shall mean the State of Colorado, acting on behalf of CDPHE.

ss. "United States" shall mean the United States of America, acting on behalf of EPA.

tt. "Volatile Organic Compounds" or "VOCs" shall mean volatile organic compounds as defined in 40 C.F.R. §§ 60.2, 60.481 and 60.481a.

uu. "Week" or "weekly" shall mean the standard calendar period, except as otherwise provided in applicable LDAR Regulations.

## IV.    CIVIL PENALTY

11. No later than 30 Days after the Effective Date, DCP shall pay to the United States and the State the sum of $3,250,000 as a civil penalty, together with interest accruing from the date on which the Consent Decree is lodged with the Court, at the rate specified in 28 U.S.C. § 1961 as of the date of lodging.

12. **Federal Payment Instructions.** DCP shall pay the portion of the civil penalty due the United States, $1,625,000, by FedWire Electronic Funds Transfer ("EFT") to the U.S.

Department of Justice account, in accordance with instructions provided to DCP by the Financial

Litigation Unit ("FLU") of the United States Attorney's Office for the District of Colorado after

the Effective Date.  The payment instructions provided by the FLU will include a Consolidated

Debt Collection System ("CDCS") number, which DCP shall use to identify all payments

required to be made in accordance with this Consent Decree.  The FLU will provide the payment

instructions to:  George R. Green, Group Vice President and General Counsel, DCP Operating

Company, LP, 6900 E. Layton Ave., Suite 900, Denver, Colorado 80237-3658,

GRGreen@dcpmidstream.com, (303) 595-3331, on behalf of DCP.  DCP may change the

individual to receive payment instructions on its behalf by providing written notice of such

change to the United States and EPA in accordance with Section XV (Notices).

13.    At the time of payment, DCP shall send notice that payment has been made: (i) to

EPA via email at cinwd_acctsreceivable@epa.gov or via regular mail at EPA Cincinnati Finance

Office, 26 W. Martin Luther King Drive, Cincinnati, Ohio 45268; and (ii) to the United States

via email or regular mail in accordance with Section XV, and (iii) to EPA in accordance with

Section XV. Such notice shall state that the payment is for the civil penalty owed pursuant to the

Consent Decree in United States and the State of Colorado v. DCP Operating Company, LP et al.

and shall reference the civil action number, CDCS Number and DOJ case number 90-5-2-1-

12335.

14.    **State Payment Instructions.**  DCP agrees to pay $1,625,000 in civil penalties to

the State by certified, corporate or cashier's check drawn to the order of "Colorado Department

of Public Health and Environment" and delivered to the attention of Enforcement Unit

Supervisor, Air Pollution Control Division, 4300 Cherry Creek Drive South, APCD-SS-B1,

Denver, Colorado 80246-1530.  At the time of payment, DCP shall send notice that payment has

been made to the State in accordance with Section XV (Notices). Such notice shall state that the payment is for the civil penalty in *United States and the State of Colorado v. DCP Operating Company, LP et al.* and shall reference the civil action number.

15. DCP shall not deduct any penalties paid under this Decree pursuant to this Section or Section IX (Stipulated Penalties) in calculating its federal, state, or local income tax.

## V.    COMPLIANCE REQUIREMENTS

### A.    NSPS APPLICABILITY

16. **NSPS OOOOa Applicability.** No later than 90 Days after the Effective Date, DCP shall accept applicability of and comply with 40 C.F.R. Part 60, Subpart OOOOa at all Affected Facilities. Subpart OOOOa applicability shall be incorporated into DCP's permits as described in Paragraphs 35–36.

### B.    **LDAR PROGRAM**

17. **LDAR Program**

a. **Applicability.** The requirements of this LDAR Program shall apply to all Covered Equipment and all Covered Process Units at the Covered Facilities. The requirements of this LDAR Program are in addition to, and not in lieu of, the requirements of any other LDAR Regulation that may apply to Covered Equipment. If there is a conflict between an LDAR Regulation and this LDAR Program, DCP shall follow the more stringent requirement.

b. Information pertaining to any non-Covered Equipment that remains in the LDAR Database is not included in LDAR compliance calculations (e.g., the percentage of valves found Leaking).

c. **Summary**. As more fully described in this Section, the LDAR Program requires DCP to:

| Requirement | Paragraph |
|---|---|
| Develop an LDAR Document for each Covered Facility | 18 (Facility-Wide LDAR Document) |
| Conduct LDAR monitoring of Covered Equipment using Method 21 and a data logger (or equivalent instrument) | 19 (Method 21 Data Logging) |
| Monitor Covered Equipment at frequency specified in Paragraph 20.a | 20 (Monitoring Frequency) |
| Repair Leaking Covered Equipment | 21 (Action Levels), 22 (Repairs), and 23 (Drill-and-Tap for Valves) |
| Follow the Consent Decree's requirements for any Covered Equipment placed on DOR | 24 (Delay of Repair) |
| Implement a Valve Replacement and Improvement Program | 25 (Valve Replacement and Improvement Program) |
| Implement a Connector Replacement and Improvement | 26 (Connector Replacement and Improvement) |
| Comply with Management of Change requirements | 27 (Management of Change) |
| Implement training protocols | 28 (Training) |
| Implement a quality assurance/quality control program | 29 (Quality Assurance/Quality Control) |
| Conduct at least three LDAR audits of each Covered Facility except Bighorn, for which at least one third-party LDAR audit must be conducted | 30 (LDAR Audits), 31 (Corrective Action), and 32 (Certification of Compliance) |

## 18.    Facility-Wide LDAR Document

a.    By no later than 120 Days after the Effective Date, DCP shall develop for

17

each Covered Facility a facility-wide document ("LDAR Document") that describes:

(i)    Applicability of the LDAR Program and LDAR Regulations to process units or specific equipment; Leak definitions; monitoring frequencies;

(ii)    A tracking program (e.g., Management of Change ("MOC") Protocol as provided in Paragraph 27) that ensures that new equipment added to the Covered Facility is integrated into the LDAR Program and that equipment taken out of service is removed;

(iii)    The roles and responsibilities of LDAR Personnel at the Covered Facility and the training each will receive under Paragraph 28 (Training);

(iv)    An analysis demonstrating that the number of personnel dedicated to LDAR functions is sufficient to satisfy the requirements of the LDAR Program; and

(v)    An explanation of how DCP plans to implement the LDAR Program at the Covered Facility.

b.    DCP shall submit the initial LDAR Document to EPA and CDPHE in accordance with Section XV (Notices).  After submission of the initial LDAR Document, DCP shall review the LDAR Document annually, update it by no later than December 31 of each year, and shall make the LDAR Document available to EPA and CDPHE upon request.

19.    **Method 21 Data Logging**

a.    Beginning on the Effective Date, for all Covered Equipment, DCP shall comply with Method 21 in performing LDAR monitoring, using an instrument attached to a data logger (or an equivalent instrument) which electronically records the Screening Value at each piece of Covered Equipment, the date and time of the Screening Value, and the identification

numbers of the monitoring instrument and the technician. DCP shall transfer this data at least weekly to an LDAR Database.

        b.      If, during LDAR monitoring in the field, a piece of Covered Equipment is discovered that is not listed in the data logger, DCP is permitted to monitor the piece of Covered Equipment and record, by any means available, the Screening Value, the date and time of the Screening Value, the identification numbers of the monitoring instrument and technician, and the identification number of the Covered Equipment monitored if available. In such an instance, the failure to initially record the information electronically in the data logger is not a violation of this Paragraph's requirement to record the required information electronically, provided that DCP adds the Covered Equipment and the information regarding the monitoring event into the LDAR Database within 10 Days.

    **20.**     **Monitoring Frequency**

        a.      Beginning on the Effective Date, for all Covered Equipment, DCP shall comply with the following periodic monitoring frequencies, unless: (i) more frequent monitoring is required by the LDAR Regulation; or (ii) the relevant Covered Process Unit has been permanently shut down:

          (1)      Valves: quarterly;

          (2)      Connectors: annually; and

          (3)      Pumps: monthly.

        b.      Compliance with the monitoring frequencies in Paragraph 20.a is not required when a specific, applicable LDAR Regulation excludes or exempts, fully or partially, monitoring at a periodic frequency (e.g., an exemption for equipment that is designated as unsafe-to-monitor or difficult-to-monitor, or an exemption for pumps that have no externally

actuated shaft) provided that DCP satisfies all applicable conditions and requirements for the exclusion or exemption as set forth in the applicable LDAR Regulation.

c.     The monitoring requirements in Paragraph 20 shall apply and DCP shall not use the skip/alternative monitoring provisions at 40 C.F.R. §§ 60.483-1a, 60.483-2a, and 60.482-11a(b)(3)(ii) or (iii).

21.     **Action Levels.**  Beginning on the Effective Date, if a Screening Value is at or above the applicable Leak Definition in Table 1, DCP shall perform repairs, replacements, or repacking in accordance with Paragraphs 22–26.

| TABLE 1 | |
| --- | --- |
| **Equipment Type** | **Leak Definition (ppm)** |
| Valves | 500 |
| Connectors | 500 |
| Pumps | 2,000 |

a.     DCP may elect to adjust the monitoring instrument readings for background pursuant to applicable LDAR Regulations.

b.     Beginning no later than 90 Days after the Effective Date, for all Covered Equipment, and all valves and pumps in heavy liquid service, at any time, including outside of periodic monitoring, evidence of a potential Leak is detected through olfactory, visual, or auditory sensing, DCP shall comply with all applicable regulations and, if repair is required, Paragraphs 22, 23, and 24.

22.     **Repairs.**  By no later than five Days after detecting a Leak, DCP shall perform a first attempt at repair.  By no later than 15 Days after detection, DCP shall repair the Covered

Equipment or it may place the Covered Equipment on DOR provided that DCP has complied with all applicable LDAR Regulations and with the requirements of this Paragraph 22, Paragraph 23 (Drill-and-Tap for Valves), Paragraph 24 (Delay of Repair), Paragraph 25 (Valve Replacement and Improvement Program), and Paragraph 26 (Connector Replacement and Improvement).

a.    Repair Verification Monitoring.  Beginning on the Effective Date of this Consent Decree and continuing until termination of this Consent Decree, DCP shall perform Repair Verification Monitoring by no later than the next Day after each attempt at repair of the Covered Equipment.  No Covered Equipment will be considered repaired until Repair Verification Monitoring demonstrates there is no Leak.  Repair Verification Monitoring shall confirm a Leak is repaired if:

(i)    For a Leak detected using Method 21, the Screening Value is below the applicable Leak definition in the LDAR Program; or

(ii)    For a Leak detected using an OGI instrument, no emissions are imaged by OGI or the Screening Value is below the applicable leak definition in the LDAR Program.

b.    Proactive Repair Attempt for Valves.  Beginning on the Effective Date, DCP shall make an initial attempt to repair and eliminate the emissions from any valve (except Control Valves) that has a Screening Value greater than or equal to 250 ppm and less than 500 ppm no later than five Days after detecting the emissions at such valve.  Repair Verification Monitoring in accordance with Paragraph 22.a shall be performed.  If the Screening Value during the Repair Verification Monitoring is less than 500 ppm, no further repairs under this Paragraph shall be required for that monitoring event for that valve.  If, however, the Screening Value

during the Repair Verification Monitoring is greater than or equal to 500 ppm, DCP shall comply

with the requirements in this Paragraph 22, Paragraph 23 (Drill-and-Tap for Valves), Paragraph

24 (Delay of Repair), and Paragraph 25 (Valve Replacement and Improvement Program) (and all

deadlines for such requirements shall be based on the date of the failed Repair Verification

Monitoring).

c.      Nothing in this Paragraph is intended to prevent DCP from taking Leaking

Covered Equipment out of service; provided, however, that prior to placing the Covered

Equipment back in service, DCP must repair the Leak (according to Paragraphs 22 and 23) or

must comply with the requirements of Paragraph 24 to place the Covered Equipment on DOR.

23.    **Drill-and-Tap for Valves.**  Beginning no later than 180 Days after the Effective

Date, DCP shall attempt at least one drill-and-tap repair of any Leaking valve in accordance with

this Paragraph before placing such valve on the DOR list.

a.      Valves Subject to Drill-and-Tap Requirements.  This Paragraph applies to

valves (other than Control Valves) for which other repair attempts have failed to reduce

emissions below the applicable Leak definition and that DCP is unable to remove from service.

b.      Required Sealant Re-Injection.  If the first sealant injection performed as

part of the drill-and-tap repair is unsuccessful at repairing the Leak, DCP shall perform a second

injection of an appropriate sealing material.

c.      Drill-and-Tap Exceptions.  Drill-and-tap is not required:

(i)      When Paragraph 25.f(iii)(A) (Valve Replacement and Improvement

Program) applies; or

(ii)     When there is a safety, major mechanical, major product quality, or

environmental issue with repairing the valve using the drill-and-tap method, in

22

which case, DCP shall document the reason(s) why any drill-and-tap attempt was not performed prior to placing any valve (other than Control Valves) on the DOR list. DCP may document the reason(s) in the Facility Wide LDAR Document developed pursuant to Paragraph 18.

    d.     <u>Timing for Drill-and-Tap Repairs & Provisional DOR Listing</u>.

       (i)     If a drill-and-tap attempt can reasonably be completed within the 15-Day repair period, DCP shall complete the drill-and-tap attempt in that time period.

       (ii)     If a drill-and-tap attempt cannot reasonably occur within the 15-Day repair period (e.g., if DCP's drill-and-tap contractor is not local and must mobilize to the Covered Facility), DCP provisionally may place the valve on the DOR list pending attempting the drill-and-tap repair as expeditiously as practicable. Absent one of the exceptions found in Paragraph 23.c above or as otherwise agreed to in writing by the EPA, in consultation with CDPHE, in no event may DCP take more than 30 Days from the initial Leak detection to attempt a drill-and-tap repair. If Repair Verification Monitoring in accordance with Paragraph 22.a verifies that emissions are below the Leak definitions in Paragraph 21, the valve shall be removed from the provisional DOR list and considered repaired.

    e.     As an alternative to the drill-and-tap repair method for Leaking valves (other than Control Valves) set forth in this Paragraph or in circumstances where Low-E Packing is required under Paragraph 25.f, DCP may attempt a drill-and-tap repair on any Existing Valve using Low-E Injectable Packing. If Repair Verification Monitoring confirms the use of Low-E Injectable Packing successfully repaired a Leak, the Existing Valve shall be classified as a Low-

E Valve for purposes of Paragraph 25.f.  If a drill-and-tap repair using Low-E Injectable Packing

fails to reduce emissions below the applicable Leak definition after one injection of Low-E

Injectable Packing, DCP shall place the valve on the DOR list.

24.    **Delay of Repair.**  Except for Paragraph 24.b(ii), which DCP shall implement no

later than 180 days after the Effective Date, beginning no later than the Effective Date for all

Covered Equipment placed on DOR, DCP shall:

a.    Require sign-off from the relevant supervisor of the Covered Facility or

person of similar authority that the Covered Equipment is technically infeasible to repair without

a Process Unit Shutdown, and maintain records of such supervisor sign-off in accordance with

Section XII;

b.    Periodically monitor the Covered Equipment placed on the DOR list for

the Covered Facility at the frequency specified in Paragraph 20 (Monitoring Frequency) (unless

more frequent monitoring is required under applicable LDAR Regulations); and either:

(i)    Repair the Covered Equipment within the time frame required by

the applicable LDAR Regulations, except as provided in Paragraph 24.d; or

(ii)    If Paragraph 25 (Valve Replacement and Improvement Program) or

Paragraph 26 (Connector Replacement and Improvement) applies, replace, repack,

or improve the Covered Equipment according to the timeframes set forth in

Paragraphs 25–26.

c.    DCP shall not have more than the following number of pressure relief

devices in VOC or wet gas service at each Covered Facility on the DOR list at any one time:

(i)    Greeley: 6

(ii)    Roggen: 12

(iii)    Kersey/Mewbourn: 20

(iv)    Platteville: 10

(v)     Spindle: 12

(vi)    Lucerne: 20

(vii)   O'Connor: 20

(viii)  Bighorn: 10

d.      DCP shall not allow Covered Equipment or pressure relief devices in
VOC or wet gas service to remain on DOR for longer than 18 months after a Leak is detected.
Covered Equipment on pipelines owned and operated by DCP at a Covered Facility and on
storage tanks may remain on DOR for longer than 18 months if DCP demonstrates compliance
with 40 C.F.R. § 482-9a(c)(1)–(2) and applicable requirements in Colorado Air Quality Control
Commission Regulation Number 7, Part D, Section II.I.1.a, 5 Code Colo. Reg. § 1001-9, Part
D:II.I.1.a.

e.      The provisions of Paragraphs 24.c and 24.d apply to valves, pumps,
connectors, and pressure relief devices that are subject to work practice standards (i.e., first
attempt at repair within 5 Days and repair within 15 Days). The provisions of Paragraphs 24.c
and 24.d do not apply to equipment subject to no detectable emission standards (e.g.,  pressure
relief devices in VOC or wet gas service that are required to be returned to a level of no
detectable emissions within 5 Days of a pressure release).

**25.     Valve Replacement and Improvement Program.**

a.      Beginning no later than 180 Days after the Effective Date, DCP shall
implement the Valve Replacement and Improvement Program set forth in this Paragraph.

b.      All references to "valves" in this Paragraph exclude pressure relief valves.

c.      <u>List of Existing Valves in Covered Process Units</u>.  In the initial
compliance status report required by Paragraph 40, DCP shall include a list, organized by
Covered Process Unit, of the tag numbers of all valves subject to LDAR Regulations ("Existing
Valves").

d.      <u>Proactive Initial Valve Tightening Work Practices for Each Newly-
Installed or Repacked Valve</u>.  DCP shall undertake the work practices specified in this Paragraph
with respect to each new valve that is subject to LDAR Regulations that is installed (whether the
new valve replaces an Existing Valve or is newly added to a Covered Process Unit) and each
Existing Valve that is repacked.  Upon installation (or re-installation in the case of repacking)
and prior to the valve's exposure (or re-exposure, in the case of repacking) to process fluids,
DCP shall ensure that the valve's packing gland nuts or their equivalent (e.g., pushers) are
tightened to:

(i)      The manufacturer's recommended gland nut or packing torque; or

(ii)      Any appropriate tightness that will minimize the potential for
fugitive emission Leaks of any magnitude.

e.      <u>Installing New Valves</u>.  Except as provided in Paragraphs 25.e(i), 25.e(ii),
or 25.h, DCP shall ensure that each new valve (other than a valve that serves as the closure
device on an open-ended line) that it installs in each Covered Process Unit and that, when
installed, will be subject to applicable LDAR Regulations, will be either a Low-E Valve or be
fitted with Low-E Packing. This requirement applies to entirely new valves that are added to a
Covered Process Unit and to Existing Valves that are replaced in a Covered Process Unit for any
reason other than a required replacement or repacking pursuant to Paragraph 25.f.

(i)      Paragraph 25.e shall not apply in emergencies or exigent

26

circumstances requiring immediate installation or replacement of a valve where a Low-E Valve or Low-E Packing is not available on a timely basis.  Any such instances shall be reported in the next status report due under Paragraph 40.

(ii)     Paragraph 25.e shall not apply to valves that are installed temporarily for a short-term purpose and then removed (e.g., valves connecting a portion of the Covered Process Unit to a testing device).

f.     <u>Required Replacement or Repacking of Leaking Existing Valves with Low-E Valves or Low-E Packing</u>.

(i)     Except as provided in Paragraph 25.h (Commercial Unavailability of a Low-E Valve or Low-E Packing), for each Existing Valve that has a Screening Value at or above 500 ppm twice in any 4-year period, DCP shall either replace the Existing Valve with a Low-E Valve or repack the Existing Valve with Low-E Packing.

(ii)     <u>Timing</u>.  DCP shall replace or repack an Existing Valve pursuant to Paragraph 25.f by no later than 30 Days after the monitoring event that triggered the replacing or repacking requirement, unless DCP complies with either of the following:

(A)     <u>Permissible Delay Despite Diligent Efforts</u>.  Where replacement or repacking does not require a Process Unit Shutdown, delayed replacement or repacking beyond the 30 Days is permissible only when DCP meets the following criteria:

(1)     Prior to the 30-Day deadline, DCP must take actions necessary to obtain the required Low-E Valve or Low-E

Packing, including all necessary associated materials, as
expeditiously as practicable, and retain documentation of the
actions taken and the date of each such action; DCP shall make the
documentation available upon request by the EPA or CDPHE;

(2)　　If, despite DCP's efforts to comply with
Paragraph 25.f(ii)(A)(1), the required valve or valve packing,
including all necessary associated materials, is not available in
time to complete the installation within 30 Days, DCP must
comply with Paragraph 25.f(iii) and take all reasonable actions to
minimize emissions from the valve pending completion of the
required replacing or repacking. Examples include: 1) more
frequent monitoring, with additional repairs as needed; or 2) where
practical, interim replacing or repacking of a valve with a valve
that is not a Low-E Valve or with packing that is not Low-E
Packing; and

(3)　　DCP must promptly perform the required replacing
or repacking after DCP's receipt of the Low-E Valve or Low-E
Injectable Packing, including all necessary associated materials.

(B)　　Delay due to Required Process Unit Shutdown.　If
replacing or repacking requires a Process Unit Shutdown, DCP shall
replace or repack the Existing Valve during the first Process Unit
Shutdown that follows the monitoring event that triggered the requirement
to replace or repack the valve, unless DCP:

28

(1)    Documents that insufficient time existed between the monitoring event and the Process Unit Shutdown to enable DCP to purchase and install the required Low-E Valve or Low-E Valve packing technology; DCP shall make the documentation available upon request by the EPA or the State; and

(2)    Replaces or repacks the valve at the next Process Unit shutdown that occurs after DCP's receipt of the Low-E Valve or Low-E Valve packing, including all necessary associated materials.

(iii)    <u>Applicable Requirements Pending Replacement or Repacking</u>.

(A)    <u>Applicability of Drill-and-Tap Requirements</u>:  DCP shall not be required to comply with the drill-and-tap requirements of Paragraph 23 pending replacing or repacking pursuant to Paragraph 25.f if DCP completes the replacing or repacking by the date that is no later than 30 Days after detecting the Leak. If DCP does not complete the replacing or repacking within 30 Days, or if at the time of the Leak detection DCP reasonably can anticipate that they will not be able to complete the replacing or repacking within 30 Days, DCP shall comply with all applicable requirements of Paragraphs 22–24.

(B)    <u>Actions Required Pursuant to Applicable Regulations</u>: For each Existing Valve that has a Leak that DCP cannot repair through replacement or repacking within 15 Days, DCP shall comply with all applicable LDAR Regulations and the LDAR Program, including

29

Paragraphs 22 (Repairs), 23 (Drill-and-Tap for Valves), and 24 (Delay of

Repair) pending replacing or repacking pursuant to Paragraph 25.f.

g.      Provisions Related to Low-E Valves and Low-E Packing.

(i)      Low-E Status Not Affected by Subsequent Leaks.  If, during

monitoring or after installation, a Low-E Valve or a valve using Low-E Packing

Leaks, the Leak in and of itself is not a violation of this Consent Decree, does not

invalidate the "Low-E" status or use of that type of valve or packing technology,

and does not require replacing other, non-Leaking valves or packing technology of

the same type.

(ii)      Repairing Low-E Valves.  If, during monitoring after installation, a

Low-E Valve or a valve using Low-E Packing Leaks, Paragraphs 22–24 shall

apply.

(iii)      Replacing or Repacking Low-E Valves.  DCP shall replace or

repack a Low-E Valve or a valve using Low-E Packing in accordance with the

procedures and requirements for replacing or repacking Leaking Existing Valves

under Paragraph 25.f when:

(A)      the Low-E Valve or valve with Low-E Packing is found

Leaking during any monitoring event; or

(B)      DCP replaces or repacks a Low-E Valve or valve with

Low-E Packing for any reason.

h.      Commercial Unavailability of a Low-E Valve or Low-E Packing.  DCP

shall not be required to utilize a Low-E Valve or Low-E Packing to replace or repack a valve if a

Low-E Valve or Low-E Packing is not commercially available.  The factors relevant to the

question of commercial availability and the procedures that DCP must follow to assert that a Low-E Valve or Low-E Packing is not commercially available are set forth in Appendix A.

        i.      <u>Records of Low-E Valves and Low-E Packing</u>.  Prior to installing any Low-E Valve or Low-E Packing, or if not possible before installation, then as soon as practicable after installation, DCP shall secure from each manufacturer documentation that demonstrates that the proposed valve or packing technology meets the definition of "Low-E Valve" or "Low-E Packing."  DCP shall make the documentation available upon request by the EPA or CDPHE.

        j.      Nothing in Paragraphs 25.e–h requires DCP to use any valve or valve packing technology that is not appropriate for its intended use in a Covered Process Unit.

    26.    **Connector Replacement and Improvement.**  Beginning no later than 180 Days after the Effective Date, for each connector that Leaks in any two of three consecutive monitoring periods, DCP shall replace or improve the connector in accordance with the applicable replacement or improvement described in Paragraph 26.a.  In determining the applicability of this Paragraph, DCP need not consider Repair Verification Monitoring conducted in accordance with Paragraph 22.a or monitoring conducted while the connector is on DOR. DCP shall use best efforts to install a replacement or improvement that, using good engineering judgment, will be the least likely to Leak for the service, operating conditions, and type of piping or tubing to which the connector is connected.

        a.      DCP shall replace or improve Existing Connectors in accordance with Table 2:

| TABLE 2 | |
|---|---|
| **Connector Type** | **Replacement or Improvement Description** |
| Flanged | Replacement or improvement of the gasket |
| Threaded | Replacement or improvement of the thread sealing material or replacement of the connector with a like-kind connector or other |
| Compression | Replacement or improvement of compression fitting or replacement of the connector with a like-kind connector or other |
| CamLock | Replacement or improvement of the gasket or replacement or improvement of the CamLock |
| Quick Connect | Replacement or improvement of the gasket, if applicable, or replacement of the connector (with either a like-kind connector or other), if there is no gasket |
| Tubing Connectors and Connectors Equal to or Less than 1 inch in size | Replacement of the connector with a like-kind connector or other |
| Any Type | Elimination (*e.g.,* through welding, pipe, etc.) |

For purposes of this Paragraph and Table 2, "gasket" means a sealing element that includes, but is not limited to, an O-ring, gasket, or D-ring.

       b.    Like-Kind Replacement Requirements.  Where DCP employs a like-kind replacement as the method for replacing or improving an Existing Connector (e.g., a Quick Connect replaces another Quick Connect), DCP shall comply with the requirements of Paragraphs 26.b(i) and b(ii):

          (i)    If there are types, models or styles of a like-kind connector that are less likely to Leak than the Existing Connector, and one or more of those types, models or styles are technically feasible to use (considering the service, operating

conditions, and type of piping or tubing that the connector is connected to), and would not create a safety, major mechanical, major product quality, regulatory or other issue, DCP shall select a like-kind connector from among such types, models or styles.

(ii)     If Paragraph 26.b(i) does not apply, DCP may install a like-kind connector that is the same type, model or style as the Existing Connector.

c.     <u>Timing</u>.

(i)     If the replacement or improvement does not require a Process Unit Shutdown, DCP shall undertake the replacement or improvement within 30 Days after the monitoring event that triggers the replacement or improvement requirement.

(ii)     If the replacement or improvement requires a Process Unit Shutdown, DCP shall undertake the replacement or improvement during the first Process Unit Shutdown that follows the monitoring event that triggers the requirement to replace or improve the connector, unless DCP documents that insufficient time existed between the monitoring event and the Process Unit Shutdown to enable DCP to secure and install the replacement or improvement. In that case, DCP shall undertake the replacement or improvement at the next Process Unit Shutdown that follows thereafter.

d.     Nothing in this Paragraph requires DCP to utilize any connector that is not appropriate for its intended use in a Covered Process Unit, or to eliminate any Existing Connector listed in Table 2.

27.     **Management of Change.**  Beginning no later than the Effective Date, DCP shall

implement a "Management of Change Protocol" at each of the Covered Facilities that ensures:

      a.      Each valve, pump, and connector added to a Covered Process Unit at the Covered Facility for any reason is evaluated to determine if it is subject to the LDAR Program;

      b.      If any Covered Equipment is physically removed from a Covered Process Unit, the equipment is no longer subject to the LDAR Program;

      c.      Information, including monitoring relating to any Covered Equipment that is removed from any Covered Process Unit, is maintained in accordance with the applicable LDAR Regulations and this Consent Decree.

    **28.   Training**

      a.      <u>Training Protocol</u>.  By no later than 180 Days after the Effective Date, DCP shall develop, for each Covered Facility, a training protocol for all LDAR Personnel (or as applicable, require its contractor(s) to develop a training protocol for the contractor's employees).

      b.      <u>Initial Training</u>.  By no later than 180 Days after the Effective Date, DCP shall ensure that all LDAR Personnel have completed training on all aspects of LDAR, including the LDAR Program, that are relevant to the person's duties.

      c.      <u>Refresher Training</u>.  Once each calendar year beginning in the calendar year after completion of initial training, DCP shall ensure that all LDAR Personnel complete refresher training; provided, however, that refresher training is not required if an individual's employment at a Covered Facility ceases prior to the end of the calendar year or the individual's job duties no longer include implementing the LDAR Program or LDAR Regulations.

      d.      <u>New LDAR Personnel Training</u>.  DCP shall ensure that new LDAR Personnel are sufficiently trained on all aspects of LDAR that are relevant to the person's duties

no more than 90 Days prior to implementing any aspect of the LDAR Program or LDAR

Regulations (other than supervised involvement for purposes of training).

    **29.   Quality Assurance/Quality Control**

        a.     <u>Daily Certification by Monitoring Technicians</u>.  Beginning no later than

30 Days after the Effective Date, at the end of each Day that monitoring occurs DCP shall ensure

that each monitoring technician certifies that the data collected accurately represents the

monitoring performed for that Day by requiring the monitoring technician to sign a form that

includes the following certification:

> On [insert date], I reviewed the monitoring data that I collected today and to the
> best of my knowledge and belief, the data accurately represents the monitoring
> that I performed today.

        b.     <u>QA/QC Review</u>.  Beginning no later than the first full Quarter after the

Training is completed under Paragraph 28, at times that are not announced to the LDAR

monitoring technicians, an LDAR-trained employee or contractor of DCP, who does not serve on

a routine basis as an LDAR monitoring technician at the Covered Facility, shall undertake the

following no less than once per calendar Quarter at each Covered Facility:

        (i)     Verify that equipment was monitored at the appropriate frequency;

        (ii)     Verify that proper documentation and sign-offs have been recorded

for all equipment placed on DOR;

        (iii)     Verify that repairs have been performed in the required periods;

        (iv)     Review monitoring data and equipment counts (e.g., number of

pieces of equipment monitored per Day) for feasibility and unusual trends;

        (v)     Verify that proper calibration records and monitoring instrument

maintenance information are maintained;

(vi)    Verify that LDAR records are maintained as required; and

(vii)    Observe in the field each LDAR monitoring technician who is conducting Leak detection monitoring to ensure that monitoring during the quarterly QA/QC is being conducted as required.

c.    DCP shall promptly correct any deficiencies detected or observed through the QA/QC Review in Paragraph 29.b and maintain, in electronic format (preferred), a log that: (i) records the date and time that the reviews, verifications, and observations required by this Paragraph 29.b are undertaken; and (ii) describes the nature and timing of any corrective actions taken.  DCP shall submit the log, including any planned corrective actions, to the United States and the State within 30 days of completing the quarterly QA/QC Review.

30.    **LDAR Audits**

a.    <u>Audit Schedule</u>.  DCP shall complete at least three LDAR Audits of each Covered Facility except Bighorn, for which at least one third-party LDAR Audit must be conducted during the term of the Consent Decree.  DCP shall ensure that each LDAR Audit is conducted in accordance with the following schedule:

(i)    For the first LDAR Audit the LDAR Audit Commencement Date shall be no later than 365 Days after the Effective Date;

(ii)    For the second LDAR Audit the LDAR Audit Commencement Date shall be no sooner than 2 years after the Effective Date;

(iii)    For the third LDAR Audit the LDAR Audit Commencement Date shall be no sooner than 4 years after the Effective Date; and

(iv)    Each LDAR Audit shall be completed on the LDAR Audit Completion Date.

36

b.      LDAR Auditor Selection Requirements.  For the LDAR Audits required under this Consent Decree, DCP shall retain a third-party consultant with experience in conducting LDAR audits, except that, at its discretion, DCP may conduct the second LDAR Audit at Covered Facilities internally with its own personnel, provided that: the personnel DCP uses are not employed at the Covered Facility being audited but rather are employed centrally at one or more other facilities owned or operated by DCP; and the personnel are experienced in the LDAR Program at such other facilities that have previously implemented or are currently implementing an LDAR Program. For each third-party LDAR Audit, DCP may not select LDAR Personnel at any Covered Facility to be the LDAR Auditor.  DCP may not hire the LDAR Auditor as the Covered Facility's LDAR Personnel during the life of this Consent Decree.  The third-party LDAR Auditor must be unaffiliated with DCP, its subsidiaries, and related entities; there can be no common ownership between DCP and the third-party LDAR Auditor.

c.      Audit Scope & Content.  For each Covered Process Unit, the LDAR Auditor in each LDAR Audit shall:

(i)      Review compliance with all applicable LDAR Regulations, including:

(A)      A determination of the LDAR requirements applicable to each Covered Process Unit at the Facility; and

(B)      A review of LDAR requirements related to valves, pumps, and connectors in heavy liquid service;

(ii)      Review or verify the same items required to be reviewed or verified in Paragraph 29.b;

(iii)      Verify that all Covered Equipment is included in the LDAR

37

Program;

(iv)     Perform "Comparative Monitoring" as described in Paragraph 30.d; and

(v)     In each subsequent Audit after the first Audit at each Covered Facility, review the Covered Facility's compliance with the LDAR Program.

d.     Comparative Monitoring.  Comparative monitoring during LDAR Audits shall be undertaken as follows:

(i)     Calculating a Comparative Monitoring Audit Leak Percentage. Covered Equipment shall be monitored in order to calculate a Leak percentage for each Covered Process Unit.  For descriptive purposes under this Paragraph, the monitoring that takes place during an LDAR Audit shall be called "Comparative Monitoring" and the Leak percentages derived from the Comparative Monitoring shall be called the "Comparative Monitoring Audit Leak Percentages."  DCP shall undertake comparative monitoring of the Covered Equipment in each Covered Process Unit during each LDAR Audit.  In undertaking Comparative Monitoring, DCP shall not be required to monitor every component in each Covered Process Unit.

(ii)     Calculating the Historic, Average Leak Percentage from Prior Periodic Monitoring Events.  DCP shall average the Leak percentages from the following monitoring periods immediately preceding the comparative monitoring to calculate the "Historic, Average Leak Percentage" for each type of Covered Equipment.  The Historic, Average Leak Percentage shall be broken down by each Process Unit and Covered Type of Equipment.

(1)     Valves – four (4) quarterly monitoring periods;

(2)     Pumps – twelve (12) monthly monitoring periods;

(3)     Connectors – four (4) annual monitoring

periods.  DCP shall use all available monitoring periods if four (4)

annual monitoring periods are not available at the time of

comparative monitoring.

(iii)     <u>Calculating the Comparative Monitoring Leak Ratio</u>.  For each

Covered Process Unit, the ratio of the Comparative Monitoring Audit Leak

Percentage from Paragraph 30.d(i) to the Historic, Average Leak percentage from

Paragraph 30.d(ii) shall be calculated. This ratio shall be called the "Comparative

Monitoring Leak Ratio."  If the denominator in this calculation is "zero," it shall

be assumed (for purposes of this calculation but not for any other purpose under

this Consent Decree or under any applicable laws and regulations) that one

Leaking piece of Covered Equipment was found in a Process Unit through routine

monitoring during the monitoring periods referenced in Paragraph 30.d(ii) before

the Comparative Monitoring.

e.     <u>Audit Report</u>.  Within 120 Days of the LDAR Audit Commencement Date

for any LDAR Audit of a Covered Facility, the LDAR Auditor shall prepare and simultaneously

submit to the EPA and CDPHE a written report ("Audit Report") that describes:

(i)     A summary of findings with respect to the topics specified in

Paragraphs 30.c(i) through 30.c(iii) and 30.c(v);

(ii)     The raw data in spreadsheet format with respect to the comparative

monitoring described in Paragraph 30.d;

(iii)    The Comparative Monitoring Audit Leak Percentage for each

Process Unit calculated pursuant to Paragraph 30.d(i); and

(iv)    The Comparative Monitoring Leak Ratio for each Process Unit

calculated pursuant to Paragraph 30.d(iii).

**31. Corrective Action**

a.    <u>Scope of Corrective Action</u>.  DCP shall complete necessary corrective

action(s) at the Covered Facility to address:

(i)    Any noncompliance or deficiencies identified during, or as a result

of, the LDAR Audit; and

(ii)    Any equipment Leaks from Covered Equipment if the Comparative

Monitoring Leak Ratio calculated pursuant to Paragraph 30.d(iii) is 3.0 or higher

and the Comparative Monitoring Audit Leak Percentage calculated pursuant to

Paragraph 30.d(i) is greater than or equal to 0.5 percent at a Covered Process Unit.

b.    <u>Timing/Schedule for Corrective Action</u>.  If DCP has not completed (or

does not expect to complete) each corrective action required under Paragraph 31.a within 90

Days of submitting the Audit Report, DCP shall develop a Corrective Action Plan ("CAP") for

the Covered Facility in accordance with Paragraph 31.c.

c.    <u>CAP</u>.

(i)    <u>Required Contents of a CAP</u>.  A CAP shall:

(A)    Explain the reasons why corrective action under Paragraph

31.a was not completed within 90 Days of the Audit Report; and

(B)    Propose a schedule for prompt completion of all such

corrective action(s) as expeditiously as practical.

(ii)    Submission of the CAP.  By no later than 120 Days after submission of the LDAR Audit Report, DCP shall submit the CAP to EPA and CDPHE.

(iii)    Review of the CAP.  EPA, in consultation with the CDPHE, may submit comments on the CAP.  Within 30 Days after receipt of any comments from EPA, DCP may submit a reply.  Disputes arising with respect to any aspect of a CAP shall be resolved in accordance with Section XI (Dispute Resolution).

(iv)    CAP Implementation.  DCP shall implement the corrective action(s) in the CAP in accordance with the schedule and, if applicable, any CAP modification.

(v)    CAP Modification.  DCP shall notify EPA and CDPHE of any modification of the CAP (including modification to the type of corrective action(s) performed or to the schedule of completion) by a written submission that includes an explanation of the reasons for the modification and that otherwise complies with Paragraph 31.c(i). The proposed CAP modification shall be submitted in accordance with Paragraph 31.c.(ii) and reviewed in accordance with Paragraph 31.c.(iii).

**32.    Certification of Compliance**

a.    Within 180 Days after the submission of an Audit Report, DCP shall certify to EPA and CDPHE that, to the signer's best knowledge and belief formed after reasonable inquiry:

(i)    Except as otherwise identified, the Covered Facility is in compliance with all applicable LDAR Regulations and this LDAR Program;

(ii)    DCP has completed all corrective actions at the Covered Facility, if

applicable, or is in the process of completing all corrective actions pursuant to a

CAP; and

(iii)    All equipment at each Covered Facility that is subject to LDAR

Regulations has been identified and included in the LDAR Program.

b.    To the extent that DCP cannot certify to Paragraphs 32.a(i)–a(iii), it shall

specifically identify any deviations from Paragraphs 32.a(i)–a(iii).

c.    If all corrective actions required under Paragraph 31 are not complete at

the time of initial certification under Paragraph 32.a, DCP shall submit a supplemental

certification by no later than 30 Days after the date of completion of any such corrective action.

## C.    OPTICAL GAS IMAGING ("OGI") PROGRAM

33.    **Optical Gas Imaging Program**

a.    <u>OGI Protocol</u>.  DCP shall develop a protocol for OGI monitoring of all

Covered Equipment, and Fin Fan Unit plugs in light liquid and/or gas/vapor service (as defined

in 40 C.F.R. § 60.481a), at Covered Facilities.  The OGI Protocol shall ensure:

(i)    Use of an optical gas imaging instrument ("OGI Instrument") that

complies with the requirements of 40 C.F.R. § 60.18(i)(1);

(ii)    Consideration of parameters such as viewing distance, thermal

background, wind speed, interferences (e.g., steam), and operator training, unless

sufficiently addressed by the instrument manufacturer's operating parameters.  If

DCP is relying on manufacturer's operating parameters, include those parameters

in the OGI Protocol;

(iii)    Instrument checks on each day an OGI Instrument is used that

comply with the requirements of 40 C.F.R. § 60.18(i)(2) and ensure that the OGI

Instrument can effectively detect Leaks under the conditions outlined in Paragraph

33.a(ii) above;

(iv)    Maintenance of the OGI Instrument in accordance with the

manufacturer's recommendations;

(v)    Operation of the OGI Instrument in accordance with the

manufacturer's operating parameters;

(vi)    OGI Leaks are defined consistent with Paragraph 10.cc; and

(vii)    Performance of OGI monitoring by a technician certified to detect

Leaks using OGI.

b.    Submission and Approval of the OGI Protocol.  By no later than 60 Days

after the Effective Date, DCP shall submit the OGI Protocol to EPA and CDPHE for review and

approval.  EPA's review and approval of the OGI Protocol, in consultation with CDPHE, shall

follow the procedures set forth in Paragraph VIII.46 (Approval of Deliverables).

c.    Semi-Annual OGI Monitoring Program.

(i)    Starting no later than 30 Days after EPA's approval of the OGI

Protocol, DCP shall conduct its first semi-annual OGI monitoring of all Covered

Equipment in accordance with the EPA-approved OGI Protocol.  OGI monitoring

shall be conducted semi-annually after the first monitoring.

(ii)    By no later than 30 Days after EPA's approval of the OGI Protocol,

DCP shall comply with Paragraph 33.e below.

d.    Fin Fan Unit OGI Monitoring Program.

(i)    By no later than 30 Days after EPA's approval of the OGI Protocol,

43

DCP shall identify all Fin Fan Units at each Covered Facility that are in light liquid and/or gas/vapor service, as defined in 40 C.F.R. § 60.481a, and DCP shall commence to monitor all plugs on such Fin Fan Units in accordance with the EPA-approved OGI Protocol as follows:

      (A)     DCP shall, on a quarterly frequency, monitor all plugs on the Fin Fan Unit with an OGI Instrument.

      (B)     No sooner than two years after the Effective Date, DCP may elect to monitor all plugs on the Fin Fan Unit in accordance with Paragraph 33.d semi-annually if the Leak rate is determined to be below 0.5%.

(ii)     By no later than 30 Days after EPA's approval of the OGI Protocol, DCP shall comply with Paragraph 33.e below with respect to Covered Facilities that operate Fin Fan Units that are in light liquid and/or gas/vapor service.

e.     <u>Repairs of Leaks</u>.  This Paragraph applies to all Leaks that are detected during an OGI monitoring event regardless of whether such Leaks were found with the OGI Instrument or whether the Leaks are detected using olfactory, visual, and auditory inspections during an OGI survey.

(i)     <u>Covered Equipment</u>: DCP shall repair (or, if applicable, replace) and re-monitor Leaking Covered Equipment in accordance with Paragraphs 22–26.

(ii)     <u>Fin Fan Unit Plugs</u>: With respect to Leaking Fin Fan Unit plugs, DCP shall:

      (A)     Perform a first attempt at repair no later than 5 Days after detecting a Leak;

(B)     Repair the Leaking Fin Fan Unit plug (a) no later than 15

Days after detecting the Leak unless such repair requires a Process Unit

Shutdown; or (b) if repair requires a Process Unit Shutdown, complete the

repair no later than the end of the next Process Unit Shutdown; and

(C)     Perform Repair Verification Monitoring in accordance with

Paragraph 22.a.

(iii)    <u>Leaks from Equipment Other than Covered Equipment or Fin Fan
Unit Plugs</u>.  If, during OGI monitoring under Paragraph 33, DCP detects Leaking

equipment that is not Covered Equipment or a Fin Fan Unit plug, DCP shall repair

and re-monitor the equipment in accordance with Subpart OOOOa or any other

applicable LDAR Regulation.

**D.     SECTION V COMPLIANCE REQUIREMENTS RECORDKEEPING**

34.    DCP shall keep all records required by this Paragraph to document compliance with

Section V (Compliance Requirements) as provided in Paragraph 74. Upon request by EPA or

CDPHE, DCP shall make all such documents available to the requesting party and shall provide,

in electronic format if so requested, all LDAR monitoring data generated during the term of this

Consent Decree.

a.     <u>Paragraph 22 (Repairs) and Paragraph 23 (Drill-and-Tap for Valves)</u>. DCP

shall record the following information for all repairs pursuant to Paragraphs 22 and 23 in the

LDAR Database:

(i)     the date of all repair attempts;

(ii)    the repair methods used during each repair attempt;

(iii)   the date, time and Screening Values for all Repair Verification

Monitoring or, if OGI is used, the video recording of the successful repair must be preserved pursuant to Paragraph 74; and

(iv)    if applicable, documentation of compliance with Paragraphs 23 and 24 for Covered Equipment placed on DOR.

b.    Paragraph 28 (Training).  DCP shall maintain a record of the dates of initial and refresher training for all LDAR Personnel, including a list of attendees.  Upon written request by the EPA or CDPHE, DCP shall provide the training records for LDAR Personnel.

c.    Paragraph 29 (Quality Assurance/Quality Control).  DCP shall maintain a log that includes:

(i)    The date and time that the reviews, verifications, and observations required by Paragraph 29 are undertaken and the names of the individuals who completed these actions;

(ii)    A description of all deficiencies detected or observed during the QA/QC Review required pursuant to Paragraph 29, and

(iii)    A description of the nature and timing of any corrective actions taken.

d.    Paragraph 30 (LDAR Audits).  DCP shall maintain all Audit Reports prepared under Paragraph 30.

e.    Paragraph 33 (Optical Gas Imaging).  DCP shall maintain the following records for five years from the date of inspection:

(i)    Identification of any Fin Fan Units in light liquid and/or gas/vapor service at the Covered Facility;

(ii)    All OGI surveys;

46

(iii)    Records of the instrument checks conducted pursuant to 40 C.F.R.

§ 60.18(i)(4)(v);

(iv)    Identification and location of Leaks and associated video

recordings;

(v)    Timing and efficacy of all first attempt and final repairs; and

(vi)    Repair Verification Monitoring on all Leaking equipment and Fin

Fan Units.

VI.    **INCORPORATION OF CONSENT DECREE REQUIREMENTS INTO**
**FEDERALLY ENFORCEABLE PERMITS**

35.    **Permits to Ensure Survival of Consent Decree Limits and Standards after**
**Termination of Consent Decree**.  Within 3 years of the Effective Date, DCP shall submit

complete applications, amendments, or supplements to applicable permitting authorities for all

Covered Facilities to incorporate the following requirements and to update any related emissions

limits and standards in non-Title V, federally enforceable permits that will survive this Consent

Decree's termination.

a.    Subpart OOOOa as it applies to gas processing plants (Paragraph 16);

b.    OGI as it applies to Covered Facilities (Paragraph 33); and

c.    Operation of the DSR Project described in Section VII (Environmental

Mitigation Project).

36.    **Modification to Title V Operating Permits**.  Within 12 months of the effective

date of any permits issued by the State under Paragraph 35, DCP shall, for any Covered Facility

with a Title V Operating Permit, submit complete applications to applicable permitting

authorities to modify, amend or revise such Title V permit to incorporate the requirements

47

identified in the preceding Paragraph into the Title V Permit. The Parties agree that the incorporation of these and any related emission limits and standards into Title V Permits shall be done in accordance with applicable state or local Title V rules. The Parties agree that the incorporation may be by "amendment" under 40 C.F.R. § 70.7(d) and analogous state Title V rules, where allowed by state law.

## VII.    ENVIRONMENTAL MITIGATION PROJECT

37.    DCP shall implement an Environmental Mitigation Project consisting of Dry Seal Recompression ("DSR") system on two Solar Taurus 70 turbines (Unit IDs C-1300 and C-1400) at the Kersey/Mewbourn Natural Gas Processing Plant (the "DSR Project") to reduce fugitive methane and fugitive VOC emissions from the subject equipment seals.  In implementing the DSR Project, DCP shall spend no less than $1,150,000 in Project Dollars.

38.    DCP shall order the DSR Project system by no later than 30 Days after the Effective Date and complete the installation of the system on the Turbine C-1300 and Turbine C-1400 at the Kersey/Mewbourn Natural Gas Processing Plant within 90 days of receipt of the DSR system.  The DSR system must be installed and operational no later than 18 months after the Effective Date.

39.    **Certifications**.  As of the date of signing this Consent Decree DCP certifies, for the Environmental Mitigation Project described in Section VII:

a.    That DCP is not required to perform or develop this Environmental Mitigation Project by any federal, state, or local law or regulation; is not required to perform or develop this Project by agreement, grant, or as injunctive relief awarded in any other action in any forum; and that DCP will not use any Environmental Mitigation Project, or portion thereof, to satisfy any obligations that it has under applicable requirements of law;

48

b.      That DCP was not planning or intending to construct, perform, or implement the Environmental Mitigation Project other than in settlement of the claims resolved in this Decree;

c.      That DCP has not received and will not receive credit for the Environmental Mitigation Project in any other enforcement action;

d.      That DCP shall neither generate nor use any pollutant reductions from the emissions reductions from the Environmental Mitigation Project as netting reductions, pollutant offsets, or to apply for, obtain, trade, or sell any pollutant or emissions reduction credits;

e.      That DCP shall use its best efforts to secure as much environmental benefit as possible for the Project Dollars expended, consistent with the applicable requirements and limits of this Decree; and

f.      That in connection with any communication to the public or shareholders regarding DCP's actions or expenditures relating in any way to the Environmental Mitigation Project in this Decree, DCP shall include prominently in the communication the information that the actions and expenditures were required as part of this Decree.

## VIII.      REPORTING REQUIREMENTS

40.    After the Effective Date and until termination of this Decree pursuant to Section XIX (Termination), DCP shall submit to EPA and CDPHE a periodic report on the status of the Section V (Compliance Requirements) for each Covered Facility.  DCP shall also report on the status of the Environmental Mitigation Project in Section VII.  The initial such status report shall cover the first 365-Day period after the Effective Date and shall be due within 30 Days after the end of the 365-Day period.  Each subsequent status report shall cover a one-year period and shall be due within 30 Days after the end of the annual period covered. Each status report shall contain

the following information:

a.      The number of LDAR Personnel at the Covered Facility (excluding LDAR Personnel whose functions involve the non-monitoring aspects of repairing Leaks) and the approximate percentage of time each such person dedicated to performing LDAR functions;

b.      <u>Proactive Repair Attempt for Valves (Paragraph 22.b)</u>.  For each valve with a Screening Value greater than or equal to 250 ppm and less than 500 ppm identified in accordance with Paragraph 22.b, DCP shall record and report:

(i)      An identification of each piece of Covered Equipment that triggered a requirement under Paragraph 22.b;

(ii)     The Screening Value detected at each piece of Covered Equipment, the date and time that the Screening Value was taken, and the identification numbers of the monitoring instrument and the technician;

(iii)    The date of all repair attempts;

(iv)    The repair methods used during each repair attempt and whether the equipment was repaired;

(v)     The date, time and Screening Values for all Repair Verification Monitoring; and

(vi)    If applicable, documentation of compliance with Paragraphs 22, 23, and 24.

c.      <u>Delay of Repair (Paragraph 24)</u>.  In each report, DCP shall include:

(i)      The maximum number of pressure relief devices in VOC or wet gas service at each Covered Facility on the DOR list during the reporting period;

(ii)     A list of the Covered Equipment and pressure relief devices on

DOR at each Covered Facility during the reporting period and the amount of time

each piece of equipment has been on DOR;

(iii)     Any calculations or analyses performed for Covered Equipment or

pressure relief devices at any Covered Facility pursuant to 40 C.F.R. § 482-

9a(c)(1)–(2).

d.     Valve Replacement and Improvement Program (Paragraph 25).  In each

report, DCP shall include a separate section that describes the actions DCP took to comply with

Paragraph 25, including:

(i)     An identification of each piece of equipment that triggered a

requirement under Paragraph 25;

(ii)     The post-installation, -repacking, or -improvement Screening Value

for each piece of equipment that triggered a requirement under Paragraph 25;

(iii)     The date(s) of the action or activity taken to comply with Paragraph

25; and

(iv)     The repair method or type of action taken (i.e., replacement,

repacking, or improvement);

(v)     A list of any valves, including component ID, for which

replacement or repacking is delayed beyond 30 Days under Paragraph 25.f(ii) and

whether the delay is pursuant to Paragraph 25.f(ii)(A) or (B); and

(vi)     If applicable, a description of the emergency or exigent

circumstances for each instance when DCP does not perform the required

replacement or repacking in accordance with Paragraph 25.e;

(vii)     Identification and explanation of any requirements of Paragraph 25

that were not completed; and

(viii)    Identification of the schedule for any known future replacements, repackings, improvements, or valve eliminations, or any planned action to comply with Paragraph 25.

(ix)    A description of any claims of commercial unavailability in accordance with Paragraph 25.h and Appendix A.

(x)    In the initial report only, a list of Existing Valves in Covered Process Units as described in Paragraph 25.c.

e.    Connector Replacement and Improvement (Paragraph 26).  In each report, DCP shall include a description of the actions DCP took to comply with Paragraph 26, including:

(i)    An identification of each piece of equipment that triggered replacement or improvement under Paragraph 26.a;

(ii)    The monitoring results (Method 21 readings or OGI results) for each piece of equipment that triggered replacement or improvement under Paragraph 26.a after installation;

(iii)    A description of the existing and replacement connector types; and

(iv)    The date(s) of the action or activity taken to comply with Paragraph 26.a;

(v)    Identification of any actions required under Paragraph 26.a that were not taken along with an explanation for why the action was not taken; and

(vi)    The schedule for any planned future action to comply with Paragraph 26.c(ii).

f.    Training (Paragraph 28).  A description of the training conducted in

accordance with Paragraph 28;

g.     QA/QC (Paragraph 29).  Any deviations identified in the QA/QC performed under Paragraph 29, as well as any corrective action taken under that Paragraph;

h.     Corrective Action (Paragraph 31).  A summary of corrective action(s) taken to address each of the deficiencies identified in the Audit Report, in accordance with Paragraph 31, including:

(i)     A summary of all corrective actions taken pursuant to Paragraph 31.a during the reporting period and the specific deficiency (or deficiencies) in the Audit Report the corrective action addresses;

(ii)     The status of all actions under any CAP that was submitted during the reporting period, unless the CAP was submitted less than 30 Days before the status report was due.

i.     Optical Gas Imaging Program (Paragraph 33).  In each report, DCP shall include a description of the actions DCP took to comply with Paragraph 33, including:

(i)     An identification and description of any non-compliance with the requirements of Paragraph 33;

(ii)     The date and location (including the unique equipment identification number, if applicable) of each Leak detected during monitoring performed under Paragraph 33;

(iii)     The date and location (including the unique equipment identification number, if applicable) of each emissions imaged by the OGI Instrument that DCP verified were not Leaks using Method 21 instrument readings;

(iv)     The date of all repair attempts performed pursuant to Paragraph 33;

(v)     The repair method or type used during each repair attempt performed pursuant to Paragraph 33;

(vi)     The date, time, and results of any post-repair re-monitoring with the OGI Instrument or Method 21 performed pursuant to Paragraph 33; and

(vii)     If applicable, documentation of compliance with:

(1)     Paragraphs 22.b and 24 for Covered Equipment placed on the DOR list;

(2)     Paragraph 33.e(ii)(B) for delayed repair of Fin Fan Unit plugs; or

(3)     Paragraph 33.e for delayed repair of equipment other than Covered Equipment or Fin Fan Unit plugs.

j.     <u>Section VII (Environmental Mitigation Project)</u>.  In each report, DCP shall provide the status of the mitigation project in Section VII (Environmental Mitigation Project), including the following information:

(i)     A detailed description of the Environmental Mitigation Project as implemented;

(ii)     A description of any problems encountered in completing the Environmental Mitigation Project and all related solutions;

(iii)     An itemized list of all eligible Project Dollars expended;

(iv)     A description of the environmental benefits (including an estimate of pollutant reductions) and, to the extent feasible, a description of the public health benefits, resulting from implementation of the Environmental Mitigation

54

Project;

(v)     A certification that the Environmental Mitigation Project has been fully implemented pursuant to the provisions of this Decree.

k.     The status of milestones, including a compliance table that lists each milestone set forth in this Consent Decree, each milestone's required completion date, and the date DCP completes each milestone;

l.     The status of permits and permit applications as set forth in Section VI (Incorporation of Consent Decree Requirements into Federally Enforceable Permits);

m.     A description of any problems encountered or anticipated in complying with this Consent Decree, together with proposed solutions; and

n.     A description of any noncompliance with the requirements of this Consent Decree and an explanation of the noncompliance's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such noncompliance.  If the cause of a noncompliance cannot be fully explained at the time the report is due, DCP shall so state in the report.  DCP shall investigate the cause of the noncompliance and shall then submit an amendment to the report, including a full explanation of the cause of the noncompliance, within 30 Days of determining the cause of the noncompliance.  Nothing in this Paragraph or the following Paragraph shall relieve DCP of its obligation to provide the notice required by Section X (Force Majeure).

41.    Whenever any violation of this Consent Decree, any applicable permits or approvals, or any other event affecting DCP's performance under this Decree, may pose an immediate threat to the public health or welfare or the environment, DCP shall notify the United States and the State orally or by electronic mail as soon as possible, but no later than 24 hours

after DCP first knew of the violation or event.  Within 10 business Days of the Day DCP first

becomes aware of the violation, DCP shall provide a report to the United States and the State

containing an explanation of the violation's likely cause and of the remedial steps taken, or to be

taken, to prevent or minimize such violation.  If the cause of a violation cannot be fully

explained at the time the report is due, DCP shall so state in the report.  DCP shall investigate the

cause of the violation and shall then submit an amendment to the report, including a full

explanation of the cause of the violation, within 30 Days of the Day DCP becomes aware of the

cause of the violation.

42.    All reports shall be submitted electronically to the United States, EPA, CDPHE and

the State or in accordance with the requirements of Section XV (Notices).

43.    Each report submitted by DCP under this Section shall be signed by an official

responsible for environmental management and compliance and shall include the following

certification:

> I certify under penalty of law that this document and all attachments were prepared
> under my direction or supervision in accordance with a system designed to assure that
> qualified personnel properly gather and evaluate the information submitted.  Based on
> my inquiry of the person or persons who manage the system, or those persons directly
> responsible for gathering the information, the information submitted is, to the best of my
> knowledge and belief, true, accurate, and complete.  I have no personal knowledge that
> the information submitted is other than true, accurate, and complete.  I am aware that
> there are significant penalties for submitting false information, including the possibility
> of fine and imprisonment for knowing violations.

44.    This certification requirement does not apply to emergency or similar notifications

where compliance would be impractical.

45.    Any information provided pursuant to this Consent Decree may be used by the

United States in any proceeding to enforce the provisions of this Consent Decree and as

otherwise permitted by law.

46. **Approval of Deliverables**. This Paragraph applies to the OGI Protocol required by Paragraph 33.a.

a. After review of any plan, report, or other item submitted under this Consent Decree and that requires EPA approval, EPA, after consultation with CDPHE, shall in writing: (a) approve the submission; (b) approve the submission upon specified conditions; (c) approve part of the submission and disapprove the remainder; or (d) disapprove the submission.

b. If the submission is approved pursuant to this Paragraph, DCP shall take all actions required by the plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved. If the submission is conditionally approved or approved only in part pursuant to Paragraphs 46.a, DCP shall, upon written direction from EPA, after consultation with CDPHE, take all actions required by the approved plan, report, or other item that EPA, after consultation with CDPHE, determines are technically severable from any disapproved portions, subject to DCP's right to dispute only the specified conditions or the disapproved portions, under Section XI (Dispute Resolution).

c. If the submission is disapproved in whole or in part pursuant to Paragraphs 46.a, DCP shall, within 45 Days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the plan, report, or other item, or disapproved portion thereof, for approval, in accordance with the this Paragraph. If the resubmission is approved in whole or in part, DCP shall proceed in accordance with the preceding subparagraph.

d. If a resubmitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, EPA, after consultation with CDPHE, may again require DCP to correct any deficiencies, in accordance with the preceding subparagraphs, subject to DCP's right

to invoke Dispute Resolution and the right of the United States and the State to seek stipulated penalties as provided in Section IX (Stipulated Penalties).

e.     Any stipulated penalties applicable to the original submission, as provided in Section IX (Stipulated Penalties), shall accrue during the 45 Day period or other specified period, but shall not be payable unless the resubmission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of DCP's obligations under this Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

## IX.     STIPULATED PENALTIES

47.     DCP shall be liable for stipulated penalties to the United States and the State for violations of this Consent Decree as specified below, unless waived or reduced under Paragraph 55 or excused under Section X (Force Majeure).  A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.  Stipulated penalties will be split 50% to the United States and 50% to the State.

48.     **Demand for Stipulated Penalties**.  Subject to Section XI (Dispute Resolution) DCP shall pay stipulated penalties upon written demand by a Plaintiff no later than 60 Days after receipt of such a demand.  The United States and the State shall consult with each other prior to making a demand.  The Plaintiff making a demand for payment of a stipulated penalty shall simultaneously send a copy of the demand to the other Plaintiff.  DCP shall pay 50% of the total stipulated penalty amount due to the United States and 50% to the State.  A demand for the payment of stipulated penalties shall identify the particular violation(s) to which the stipulated

penalty relates, the stipulated penalty amount that the Plaintiffs are demanding for each violation (as can be best estimated), and the calculation method underlying the demand.

49.     **Payment of Stipulated Penalties**.  Defendants shall pay stipulated penalties owing to the United States and the State in the manner set forth and with the confirmation notices required by Section IV (Civil Penalty), except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

50.     **Failure to Pay Civil Penalty**.  If DCP fails to pay the civil penalty required to be paid under Section IV (Civil Penalty) when due, DCP shall pay a stipulated penalty of $5,000 per Day for each Day that the payment is late.  Late payment of the civil penalty, any accrued interest, and any accrued stipulated penalties shall be made in accordance with Paragraphs 12 through 15.

51.     **Violations of Section V Compliance Requirements**.  DCP shall be liable for the following stipulated penalties for violations of the following Section V Compliance Requirements:

| Consent Decree Violation | Stipulated Penalty | |
|---|---|---|
| i.  Paragraph 16: Failure to implement any applicable provision of NSPS Subpart OOOOa not otherwise specified in the stipulated penalties below. | Period of Delay or Noncompliance | Penalty per Violation per Day |
| | 1 – 15 Days<br>16 – 30 Days<br>31 Days or More | $500<br>$1,000<br>$2,000 |
| ii.  Paragraph 18 (Facility-Wide LDAR Document): Failure to timely develop and complete a written LDAR Document for each Covered Facility or failure to timely update the document on an annual basis. | Period of Noncompliance | Penalty per Day late |
| | 1 – 15 Days<br>16 – 30 Days<br>31 Days or More | $300<br>$400<br>$500 |

| iii. Paragraph 19 (Method 21): Each failure to comply with Method 21 in performing LDAR monitoring. | Monitoring Frequency for the component | Penalty per monitoring event per Process Unit |
|---|---|---|
| | Annual<br>Quarterly<br>Monthly | $20,000<br>$10,000<br>$5,000 |
| iv. Paragraph 19 (Use of Data Logger): For each failure to use a monitoring device that is attached to a data logger (or an equivalent instrument or application), and for each failure, during each monitoring event, to directly electronically record the Screening Value, date, time, and identification number of the monitoring instrument, and the identification of the technician. | $100 per failure per piece of Covered Equipment monitored | |
| v. Paragraph 19 (Monitoring Data Transfer): Each failure to transfer monitoring data to LDAR Database on at least a weekly basis. | $150 per Day for each Day the transfer is late. | |
| vi. Paragraph 20 (Monitoring Frequency): Each failure to perform monitoring at the frequencies specified in Paragraph 20. | $100 per component per missed monitoring event, not to exceed $25,000 per 30-Day period per Covered Process Unit. | |
| vii. Paragraph 22 (First Attempt at Repair): Each failure to timely perform a first attempt at repair as required by Paragraph 22. For purposes of these stipulated penalties, the term "repair" includes the required Repair Verification Monitoring in Paragraph 22.a after the repair attempt. If stipulated penalties are collected under this subparagraph, the stipulated penalties in Paragraph 51.ix do not apply. | $150 per Day for each late Day, not to exceed $1,500 per missed repair. | |

| viii.    Paragraph 22 (Final Attempt at Repair): Each failure to timely perform a final attempt at repair as required by Paragraph 22 unless not required to do so under Paragraph 24 (Delay of Repair). For purposes of these stipulated penalties, the term "repair" includes the required Repair Verification Monitoring in Paragraph 22.a after the repair attempt. If stipulated penalties are collected under this subparagraph, the stipulated penalties in Paragraph 51.ix do not apply. | Equipment Type | Penalty per component per Day late | Not to exceed |
|---|---|---|---|
| | Valves/Connectors Pumps | $300 $1,200 | $45,000 $150,000 |

| ix.  Paragraph 22.a (Repair Verification Monitoring): Each failure to timely perform Repair Verification Monitoring as required by Paragraph 22 in circumstances where the first attempt to repair the piece of equipment to eliminate the Leak was made within 5 Days and the final attempt to repair the piece of equipment to eliminate the Leak was made within 15 Days. | Equipment Type | Penalty per component per Day late | Not to exceed |
|---|---|---|---|
| | Valves/Connectors Pumps | $150 $600 | $18,750 $75,000 |

| x.  Paragraph 22.b (Proactive Repair): Each failure to perform a proactive attempt at repair under Paragraph 22.b. | $150 per Day for each late Day, not to exceed $1,500 per Leak. | |
|---|---|---|

| xi.  Paragraph 23 (Drill-and-Tap for Valves): Each failure to implement the drill-and-tap method as required by Paragraph 23. | Period of noncompliance | Penalty per Day late |
|---|---|---|
| | 1 – 15 Days 16 – 30 Days 31 Days or More | $200 $350 $500 per Day for each Day over 30, not to exceed $45,000 |

| xii. Paragraph 24 (Delay of Repair): Each improper placement of a piece of Covered Equipment on the DOR list (e.g., placing a piece of Covered Equipment on the DOR list even though it is feasible to repair it without a Process Unit Shutdown) required by Paragraph 24. | Equipment type | Penalty per component per Day on DOR list | Not to exceed |
|---|---|---|---|
| | Valves/Connectors Pumps | $300 $1,200 | $75,000 $300,000 |

| xiii.    Paragraph 24.a (Supervisor Sign-Off for Delay of Repair): Each failure to comply with the requirement that a relevant supervisor sign off on placing a piece of Covered Equipment on the DOR list. | $250 per piece of Covered Equipment. |
|---|---|

| xiv.    Paragraph 24.b(i) (Repair of Devices on Delay of Repair): Each failure to comply with the requirements of Paragraph 24.b(i). | Refer to applicable stipulated penalties in Paragraphs 51.vii and viii. |
|---|---|

| xv. Paragraph 24.b(ii) (Valve Replacement and Improvement on Delay of Repair): Each failure to comply with the requirements of Paragraph 24.b(ii). | Refer to applicable stipulated penalties in Paragraph 51.xx. |
|---|---|

| xvi.    Paragraph 24.c (Pressure Relief Devices on Delay of Repair): Each exceedance of the pressure relief device limits listed in Paragraph 24.c. | $150 per pressure relief device per Day, not to exceed $30,000 for a Covered Facility per Quarter. |
|---|---|

| xvii.    Paragraph 24.d (Length of Time for Covered Equipment and Pressure Relief Devices on Delay of Repair): For each exceedance of the time limits set forth in Paragraph 24.d. | Period of noncompliance | Penalty per component per Day late |
|---|---|---|
| | 1 – 15 Days 16 – 30 Days 31 Days or More | $250 $350 $500 per Day for each Day over 30 |

| xviii.    Paragraph 25.d (Work Practices): Each failure to comply with the work practice standards in Paragraph 25.d. | $50 per violation per valve per Day, not to exceed $30,000 for all valves in a Covered Process Unit per Quarter. |
|---|---|

| | |
|---|---|
| xix. Paragraph 25.e (Installing New Valves): Each failure to install a Low-E Valve or a valve fitted with Low-E Packing when required to do so under Paragraph 25.e. | $20,000 per failure, except as provided in Paragraph 53, below. |
| xx. Paragraph 25.f(ii) (Replacement or Repacking): Each failure, in violation of Paragraph 25.f(ii), to timely comply with the requirements to install a Low-E Valve or Low-E Packing if a Process Unit Shutdown is not required. | $500 per Day per failure, not to exceed $20,000 per failure, except as provided in Paragraph 53, below. |
| xxi. Paragraph 25.f(ii)(B) (Delay due to Required Process Unit Shutdown): Each failure, in violation of Paragraph 25.f(ii)(B), to install a Low-E Valve or Low-E Packing when required to do so during a process unit shutdown. | $20,000 per failure, except as provided in Paragraph 53, below. |
| xxii. Paragraph 26.c (Connector Replacement and Improvement): Each failure to timely comply with the requirements regarding the replacement, improvement, or repair requirements for connectors under Paragraph 26.c. | $100 per Day per failure, not to exceed $5,000 per failure. |
| xxiii. Paragraph 27 (Covered Equipment Addition): Each failure to add a piece of Covered Equipment to the LDAR Program when required to do so pursuant to the evaluation required by Paragraph 27. | $300 per piece of Covered Equipment. |
| xxiv. Paragraph 27 (Covered Equipment Deletion): Each failure to remove a piece of Covered Equipment from the LDAR Program when required to do so pursuant to Paragraph 27. | $150 per failure per piece of Covered Equipment. |
| xxv. Paragraph 28.a (Training Protocol): Each failure to timely develop a training protocol as required by Paragraph 28.a. | $50 per Day late. |

| | |
|---|---|
| xxvi.    Paragraphs 28.b-28.d (LDAR Personnel Training): Each failure to perform initial, refresher, or new LDAR Personnel training as required by Paragraphs 28.b–d. | $1,000 per person per month late. |
| xxvii.    Paragraph 29 (QA/QC): Each failure to perform any of the requirements relating to QA/QC in Paragraph 29. | $1,000 per missed requirement per quarter. |

| | Period of noncompliance | Penalty per Day late |
|---|---|---|
| xxviii.    Paragraph 30.a (LDAR Audit Schedule): Each failure to conduct an LDAR Audit for a Covered Facility in accordance with the schedule set forth in Paragraph 30.a. | 1 – 15 Days<br>16 – 30 Days<br>31 Days or More | $300<br>$400<br>$500, not to exceed $100,000 per LDAR Audit |

| | |
|---|---|
| xxix.    Paragraph 30.b (LDAR Auditor Selection): Each failure to use a third party as an auditor as required under Paragraph 30.b; each use of a third-party auditor that is not experienced in LDAR Audits, and each use of DCP's regular LDAR contractor or LDAR Personnel for a third-party LDAR Audit of a Covered Facility. If DCP elects to perform the Second LDAR Audit using its own personnel as permitted under Paragraph 30.b, each use of personnel employed at the Covered Facility; each use of personnel not experienced in the LDAR Program; each use of personnel who are not currently implementing or have not implemented an LDAR Program. | $25,000 per LDAR Audit. |

64

| | |
|---|---|
| xxx.    Paragraph 30.c (Audit Scope and Content): Except where comparative monitoring is required under Paragraph 30.d, each failure to comply with the requirements of Paragraph 30.c | $100,000 per LDAR Audit. |
| xxxi.    Paragraph 30.d (Comparative Monitoring): Each failure to comply with the Comparative Monitoring requirements of Paragraph 30.d. | $50,000 per LDAR Audit. |

| xxxii.    Paragraph 30.e (Audit Report): Each failure to timely submit an LDAR Audit Report. | Period of noncompliance | Penalty per Day late |
|---|---|---|
| | 1 – 15 Days | $300 |
| | 16 – 30 Days | $400 |
| | 31 Days or More | $500 |

| xxxiii.    Paragraph 31.a (Corrective Action): Each failure to implement a corrective action within 90 Days after the LDAR Audit Completion Date or pursuant to the schedule that DCP must propose under Paragraph 31.c if the corrective action cannot be completed in 90 Days. | Period of noncompliance | Penalty per Day Late |
|---|---|---|
| | 1 – 15 Days | $500 |
| | 16 – 30 Days | $750 |
| | 31 Days or More | $1,000 per Day, not to exceed $200,000 per LDAR Audit |

| xxxiv.    Paragraphs 31.b–c (Corrective Action Plan Submittal): Each failure to timely submit a Corrective Action Plan that conforms to the requirements of Paragraphs 31.b–c. | Period of noncompliance | Penalty per Day late |
|---|---|---|
| | 1 – 15 Days | $100 |
| | 16 – 30 Days | $250 |
| | 31 Days or More | $500, not to exceed $100,000 per LDAR Audit |

| xxxv.    Paragraph 32 (Certification of Compliance): Each failure to timely submit a Certification of Compliance that conforms to the requirements of Paragraph 32. | Period of noncompliance | Penalty per Day late |
|---|---|---|
| | 1 – 15 Days | $100 |
| | 16 – 30 Days | $250 |
| | 31 Days or More | $500, not to exceed $75,000 |

| xxxvi. Paragraph 33.a (OGI Protocol): Each failure to develop an OGI Protocol complying with the requirements of Paragraph 33.a. | Period of noncompliance | Penalty per Day late |
|---|---|---|
| | 1 – 15 Days | $300 |
| | 16 – 30 Days | $400 |
| | 31 Days or More | $500, not to exceed $50,000 |

| xxxvii. Paragraph 33.b (Submission of OGI Protocol): Each failure to timely submit the OGI Protocol required by Paragraph 33.b. | Period of noncompliance | Penalty per Day late |
|---|---|---|
| | 1 – 15 Days | $300 |
| | 16 – 30 Days | $400 |
| | 31 Days or More | $500, not to exceed $50,000 |

| xxxviii. Paragraph 33.c (Semi-Annual OGI Monitoring): Each failure to conduct OGI monitoring of Covered Equipment in accordance with the OGI Protocol, required by Paragraph 33.c. | $10,000 per missed event |
|---|---|

| xxxix. Paragraph 33.d (Fin Fan Unit OGI Monitoring): Each failure to conduct OGI monitoring at Fin Fan Units as required by Paragraph 33.d. | $10,000 per missed event |
|---|---|

| xl. Paragraph 33.e (Repairs of Leaks): Each failure to perform timely repair of Covered Equipment Leaks identified through OGI or failure to conduct timely repair of Fin Fan Unit Leaks identified through OGI, as required by Paragraph 33.e. | Equipment Type | Penalty per component per Day late | Not to exceed |
|---|---|---|---|
| | Valves | $300 | $45,000 |
| | Pumps | $1,200 | $150,000 |
| | Fin Fan Plug | $500 | $50,000 |

| xli. Paragraph 34 (Section V Recordkeeping Requirements): Each failure to comply with any recordkeeping, submission, or reporting requirement in Paragraph 34 not specifically identified above in this Table. | Period of noncompliance | Penalty per Day late |
|---|---|---|
| | 1 – 15 Days | $100 |
| | 16 – 30 Days | $250 |
| | 31 Days or More | $500 |

52.    **Other Requirements.**  DCP shall be liable for the following stipulated penalties for violations of these Consent Decree requirements:

| Consent Decree Violation | Stipulated Penalty | |
|---|---|---|
| Section VI (Permits): Failure to timely apply for any permit or approval in accordance with Section VI. | $1,000 per Day per violation | |
| Section VII (Environmental Mitigation Project): Failure to undertake or satisfactorily complete the Environmental Mitigation Project in compliance with Section VII. | Period of noncompliance | Penalty per Violation per Day |
| | 1 – 15 Days | $750 |
| | 16 – 30 Days | $1,000 |
| | 31 Days or More | $1,500 |
| Section VIII (Reporting Requirements): The following stipulated penalties shall accrue per violation per Day for each violation of the reporting requirements of this Consent Decree. | Period of noncompliance | Penalty per Day late |
| | 1 – 15 Days | $300 |
| | 16 – 30 Days | $750 |
| | 31 Days or More | $1,500 |

53.    **Stipulated Penalties in Lieu of those in Paragraphs 51.xix, xx, and xxi.**

a.    For purposes of this Paragraph, the term "Non-Compliant Valve" means a valve that is either: (i) not a Low-E Valve; or (ii) not fitted with Low-E Packing.  The term "Compliant Valve" means a valve that is either: (i) a Low-E Valve; or (ii) fitted with Low-E Packing.

b.    The stipulated penalties in Paragraph 53.c are to be used instead of those in Paragraphs 51.xix, xx, and xxi when a Non-Compliant Valve is installed instead of a Compliant Valve and all of the following requirements are met:

(i)    DCP, and not a government agency, discovers the failure involved;

(ii)    DCP promptly reports the failure to EPA and CDPHE;

(iii)    In the report, DCP sets forth a schedule for promptly replacing the Non-Compliant Valve with a Compliant Valve; provided, however that DCP shall

67

not be required to carry out an unscheduled shutdown of the affected Covered

Process Unit in proposing the schedule unless DCP so chooses;

(iv)    DCP monitors the Non-Compliant Valve once a month from the

time of its discovery until the valve is replaced with a Compliant Valve and no

Screening Values above 500 ppm are recorded;

(v)    DCP replaces the Non-Compliant Valve or Valve Packing with a

Compliant Valve or Valve Packing in accordance with the schedule set forth in

Paragraph 53.b(iii); and

(vi)    DCP demonstrates that in good faith it intended to install a

Compliant Valve but inadvertently installed a Non-Compliant Valve.

c.    The following stipulated penalties shall apply under the circumstances in

Paragraph 53.b:

(i)    In lieu of the penalty in Paragraph 51.xix, $2,000 per failure.

(ii)    In lieu of penalty in Paragraph 51.xx, $50 per Day per failure, not to

exceed $2,000.

(iii)    In lieu of the penalty in Paragraph 51.xxi, $2,000 per failure.

54.    **Other Stipulated Penalties**.  Any other violation of this Consent Decree not

otherwise specified in the stipulated penalties above: $1,000 per violation per Day.

55.    **Waiver or Reduction of Payment**.  The United States or the State may in the

unreviewable exercise of its discretion reduce or waive stipulated penalties otherwise due under

this Consent Decree.

56.    **Accrual of Stipulated Penalties.**

a.    Stipulated penalties will begin to accrue on the Day after performance is

due or the Day a violation occurs, whichever is applicable, and will continue to accrue until

performance is satisfactorily completed or until the violation ceases.  Stipulated penalties shall

accrue simultaneously for separate violations of this Consent Decree.  The penalties that accrue

for each violation or failure to perform an obligation do not increase from one period of

noncompliance to the next unless the violations or failures to perform are continuous.

      b.      <u>Accrual of Stipulated Penalties During Dispute Resolution</u>.  Stipulated

penalties shall continue to accrue during any Dispute Resolution, but need not be paid until the

following:

      (i)      If the dispute is resolved by agreement or a decision by EPA and

the State that is not appealed to the Court, DCP shall pay accrued penalties

determined to be owing, together with interest, to the United States and the State

within 30 Days of the Effective Date of the agreement or the expiration of the

period for seeking judicial resolution of a dispute set forth in Paragraph 69.

      (ii)      If the dispute is appealed to the Court and the United States and the

State prevail in whole or in part, DCP shall pay all penalties determined by the

Court to be owed, together with interest, within 60 Days of receiving the Court's

final decision or order, except if the District Court's decision is appealed, and then

as provided in Paragraph 56.b(iii), below.

      (iii)      If any Party appeals the District Court's decision, DCP shall pay all

penalties determined to be owing by the final decision of the appellate court,

together with interest, within 30 Days of receiving the final appellate court

decision.

57.    If DCP fails to pay stipulated penalties according to the terms of this Consent

Decree, DCP shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.

58.    The payment of stipulated penalties and interest, if any, shall not alter in any way DCP's obligation to complete the performance of this Consent Decree's requirements.

59.    **Non-Exclusivity of Remedy**.  Stipulated penalties are not the United States' or State's exclusive remedy for violations of this Consent Decree.  Subject to the provisions of Section XIII (Effect of Settlement/Reservation of Rights), the United States and the State expressly reserve the right to seek any other relief it deems appropriate for DCP's violation of this Decree or applicable law, including but not limited to an action against DCP for statutory penalties, additional injunctive relief, mitigation or offset measures, and/or contempt.  However, the amount of any statutory penalty assessed for a violation of this Consent Decree shall be reduced by an amount equal to the amount of any stipulated penalty assessed and paid pursuant to this Consent Decree.

## X.    FORCE MAJEURE

60.    "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of DCP, of any entity controlled by DCP, or of DCP's contractors, that delays or prevents the performance of any obligation under this Consent Decree despite DCP's best efforts to fulfill the obligation.  The requirement that DCP exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure event (a) as it is occurring and (b) following the potential force majeure, such that the delay and any adverse effects of the delay are minimized.  "Force Majeure" does not include DCP's financial inability to perform any obligation under this Consent Decree.

61.    If any event occurs or has occurred that may delay the performance of any
obligation under this Consent Decree, whether or not caused by a force majeure event, DCP shall
provide notice orally or by email to EPA and CDPHE within 72 hours of when DCP first knew
that the event might cause a delay in accordance with Section XV (Notices).  Within 15 Days
thereafter, DCP shall provide in writing to EPA and CDPHE an explanation and description of
the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to
prevent or minimize the delay; a schedule for implementation of any measures to be taken to
prevent or mitigate the delay or the effect of the delay; and DCP's rationale for attributing such
delay to a force majeure event if it intends to assert such a claim.  DCP shall include with any
notice all available documentation supporting the claim that the delay was attributable to a force
majeure.  Failure to comply with the above requirements shall preclude DCP from asserting any
claim of force majeure for that event for the period of time of such failure to comply, and for any
additional delay caused by such failure.  DCP shall be deemed to know of any circumstance of
which DCP, any entity controlled by DCP, or DCP's contractors knew or should have known.

62.    If EPA, after consultation with CDPHE, agrees that the delay or anticipated delay is
attributable to a force majeure event, the time for performance of the obligations under this
Consent Decree that are affected by the force majeure event will be extended by EPA, after
consultation with CDPHE, for such time as is necessary to complete those obligations.  An
extension of the time for performance of the obligations affected by the force majeure event shall
not, of itself, extend the time for performance of any other obligation.  EPA will notify DCP in
writing of the length of the extension, if any, for performance of the obligations affected by the
force majeure event.

63.    If EPA, after consultation with CDPHE, does not agree that the delay or anticipated

71

delay has been or will be caused by a force majeure event, EPA will notify DCP in writing of its

decision.

64.    If DCP elects to invoke the dispute resolution procedures set forth in Section XI

(Dispute Resolution), it shall do so no later than 30 Days after receipt of EPA's notice.  In any

such proceeding, DCP shall have the burden of demonstrating by a preponderance of the

evidence that the delay or anticipated delay has been or will be caused by a force majeure event,

that the duration of the delay or the extension sought was or will be warranted under the

circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and

that DCP complied with the requirements of Paragraphs 60 and 61.  If DCP carries this burden,

the delay at issue shall be deemed not to be a violation by DCP of the affected obligation of this

Consent Decree identified to EPA, CDPHE, and the Court.

## XI.     DISPUTE RESOLUTION

65.    Unless otherwise expressly provided for in this Consent Decree, the dispute

resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising

under or with respect to this Consent Decree.

66.    **Informal Dispute Resolution**.  Any dispute subject to Dispute Resolution under

this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be

considered to have arisen when DCP sends the United States and the State a written Notice of

Dispute pursuant to Section XV (Notices).   Notice of Dispute shall state clearly the matter in

dispute.  The period of informal negotiations shall not exceed 30 Days from the date the United

States receives the Notice of Dispute, unless that period is modified by written agreement.  If the

Parties cannot resolve a dispute by informal negotiations, then the position advanced by the

United States, after consultation with the State, shall be considered binding unless, within 30

Days after the conclusion of the informal negotiation period, DCP invokes formal dispute

resolution procedures as set forth below.

67.    **Formal Dispute Resolution**.  DCP shall invoke formal dispute resolution

procedures, within the time period provided in the preceding Paragraph, by serving on the United

States and the State a written Statement of Position pursuant to Section XV (Notices) regarding

the matter in dispute.  The Statement of Position shall include, but need not be limited to, any

factual data, analysis, or opinion supporting DCP's position and any supporting documentation

relied upon by DCP.

68.    The United States, after consultation with the State, shall serve its Statement of

Position within 45 Days of receipt of DCP's Statement of Position.  The United States'

Statement of Position shall include, but need not be limited to, any factual data, analysis, or

opinion supporting that position and any supporting documentation relied upon by the United

States.  The United States' Statement of Position shall be binding on DCP, unless DCP files a

motion for judicial review of the dispute in accordance with the following Paragraph.

69.    DCP may seek judicial review of the dispute by filing with the Court and serving on

the United States and the State, in accordance with Section XV (Notices), a motion requesting

judicial resolution of the dispute.  The motion must be filed within 30 Days of receipt of the

United States' Statement of Position pursuant to the preceding Paragraph.  The motion shall

contain a written statement of DCP's position on the matter in dispute, including any supporting

factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any

schedule within which the dispute must be resolved for orderly implementation of the Consent

Decree.

70.    The United States and the State shall respond to DCP's motion within the time

period allowed by the Local Rules of this Court.  DCP may file a reply memorandum to the extent permitted by the Local Rules.

71.  **Standard of Review.**

a.  <u>Disputes Concerning Matters Accorded Record Review</u>.  Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 67 pertaining to any matter that involves EPA's exercise of discretion under this Consent Decree and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, DCP shall have the burden of demonstrating, based on the administrative record as provided under the Administrative Procedures Act, 5 U.S.C. § 500 et seq. (including the Parties' Statements of Position), that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

b.  <u>Other Disputes</u>.  Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 67, DCP shall bear the burden of demonstrating that its position complies with this Consent Decree.

72.  The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of DCP under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 56.  If DCP does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section IX (Stipulated Penalties).

## XII.    INFORMATION COLLECTION AND RETENTION

73.  EPA and CDPHE and their representatives and employees shall have the right of

entry into any facility covered by this Consent Decree, at all reasonable times, upon presentation

of credentials, to:

        a.      monitor the progress of activities required under this Consent Decree;

        b.      verify any data or information submitted to the United States or the State

in accordance with this Consent Decree's terms;

        c.      obtain documentary evidence, including photographs and similar data; and

        d.      assess DCP's compliance with this Consent Decree.

74.    Until five years after the termination of this Consent Decree, DCP shall retain, and

shall instruct its contractors and agents to preserve, all non-identical copies of all documents,

records, or other information (including documents, records, or other information in electronic

form) in its or its contractors' or agents' possession or control, or that come into its or its

contractors' or agents' possession or control, and that directly relate in any manner to DCP's

performance of its obligations under this Consent Decree. This information-retention

requirement shall apply regardless of any contrary corporate or institutional policies or

procedures.  At any time during this information-retention period, upon request by EPA or

CDPHE, DCP shall provide copies of any documents, records, or other information required to

be maintained under this Paragraph.

75.    Except for emissions data, including Screening Values and OGI monitoring

recordings, DCP may also assert that information required to be provided under this Section is

protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2.  As to any

information that DCP seeks to protect as CBI, DCP shall follow the procedures set forth in 40

C.F.R. Part 2.  DCP may assert that certain documents, records, or other information are

privileged under the attorney-client privilege or any other privilege recognized by federal law. If

DCP asserts such a privilege, it shall provide the following: (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege asserted by DCP. However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

76.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by EPA or CDPHE pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of DCP to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

### XIII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

77.    This Consent Decree resolves the civil claims of the United States and the State against DCP arising under the LDAR provisions in 40 C.F.R. Part 60, Subparts KKK, OOOO, OOOOa (and by reference 40 C.F.R. Part 60, Subparts VV and VVa) from the date those claims accrued through the Date of Lodging at the following natural gas processing plants: Greeley, Roggen, Kersey/Mewbourn, Platteville, Ladder Creek (which DCP divested to an unrelated third party in December 2019), Spindle, Lucerne, and O'Connor, including the violations alleged in the Complaint filed in this action and the March 11, 2019, Notice of Violation issued to DCP Operating Company, LP concerning the Greeley, Roggen, Kersey/Mewbourn, Platteville and Ladder Creek Natural Gas Processing Plants, LDAR claims in the State Compliance Advisories Nos. 2020-089 (April 27, 2020) (Violation C), 2020-047 (April 20, 2020) (Violation A), 2020-

155 (July 2, 2020) (Violations A.i. and A.ii), 2022-001 (January 6, 2022) (Violation B), and

Notices of Violation Nos. 2020-160 (July 13, 2020) (Violations A.i., A.,ii., B.i., B.ii., and C) and

2021-034 (April 21, 2021) (Violations A, B, and C), and LDAR claims in Inspection Report

Source Number 0107 (November 19, 2021) (Inspection Summary and Conclusion A),Inspection

Report Source Number 0049 (October 24, 2021) (Inspection Summary and Conclusion A), and

Inspection Report Source Number 0015 (August 19, 2021) (Inspection Summary and Conclusion

A).

78.    The United States and the State reserve all legal and equitable remedies available to

enforce this Consent Decree's provisions.  Except as stated in Paragraph 77, this Consent Decree

shall not be construed to limit the rights of the United States or the State to obtain penalties or

injunctive relief under the Act or implementing regulations, or under other federal laws or state

laws, regulations, or permit conditions.  The United States and the State further reserve all legal

and equitable remedies to address any imminent and substantial endangerment to the public

health or welfare or the environment arising at, or posed by, the Covered Facilities, whether

related to the violations addressed in this Consent Decree or otherwise.

79.    In any subsequent administrative or judicial proceeding initiated by the United

States or the State for injunctive relief, civil penalties, other appropriate relief relating to the

Covered Facilities or DCP's violations, DCP shall not assert, and may not maintain, any defense

or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion,

claim preclusion, claim-splitting, or other defenses based upon any contention that the claims

raised by the United States or the State in the subsequent proceeding were or should have been

brought in the instant case, except with respect to claims that have been specifically resolved

pursuant to Paragraph 77.

80.    This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations.  DCP is responsible for achieving and maintaining compliance with all applicable federal, State, and local laws, regulations, and permits; and DCP's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein.  The United States and the State do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that DCP's compliance with any aspect of this Consent Decree will result in compliance with provisions of the CAA, 42 U.S.C. §§ 7411 and 7412, or with any other provisions of federal, State, or local laws, regulations, or permits.

81.    This Consent Decree does not limit or affect the rights of DCP or of the United States and the State against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against DCP, except as otherwise provided by law.

82.    This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

83.    DCP expressly denies and does not admit any liability to the United States or the State arising out of the conduct, transactions or occurrences alleged in the Complaint filed in this action or the Notice of Violation issued by the EPA on March 11, 2019 concerning the concerning the Greeley, Roggen, Kersey/Mewbourn, Platteville and Ladder Creek Natural Gas Processing Plants, and does not admit liability to  the LDAR claims in the State Compliance Advisories Nos. 2020-089 (April 27, 2020) (Violation C), 2020-047 (April 20, 2020) (Violation A), 2020-155 (July 2, 2020) (Violations A.i. and A.ii), 2022-001 (January 6, 2022) (Violation B), and Notices of Violation Nos. 2020-160 (July 13, 2020) (Violations A.i., A.,ii., B.i., B.ii., and C)

and 2021-034 (April 21, 2021) (Violations A, B, and C), and Inspection Report Source Number 0107 (November 19, 2021) (Inspection Summary and Conclusion A), Inspection Report Number Source 0049 (October 24, 2021) (Inspection Summary and Conclusion A), and Inspection Report Source Number 0015 (August 19, 2021) (Inspection Summary and Conclusion A).  Nothing in this Consent Decree shall be construed as an admission of DCP's liability, nor shall DCP's performance of any obligation under this Decree be considered any admission of liability.

<h2 style="text-align:center"><b>XIV.     COSTS</b></h2>

84.    The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States and the State shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by DCP.

<h2 style="text-align:center"><b>XV.     NOTICES</b></h2>

85.    Unless otherwise specified in this Decree, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows, except that certain communications contemplated herein and elsewhere in this Consent Decree may be submitted by DCP electronically to the United States, EPA, the State and CDPHE:

As to the United States by email:     eescdcopy.enrd@usdoj.gov
                                       Re: DJ # 90-5-2-1-12335

As to the United States by mail:      EES Case Management Unit
                                       Environment and Natural Resources Division
                                       U.S. Department of Justice
                                       P.O. Box 7611
                                       Washington, D.C. 20044-7611
                                       Re: DJ # 90-5-2-1-12335

As to EPA by mail:                    Director, Air Enforcement Division
                                      Office of Civil Enforcement
                                      USEPA Headquarters, MC 2242A
                                      1200 Pennsylvania Ave., NW
                                      Washington, D.C. 20460

                                      U.S. EPA Region 8
                                      Branch Manager, Air & Toxics Technical
                                      Enforcement Branch
                                      Enforcement and Compliance Assurance Division
                                      Technical Enforcement Program
                                      1595 Wynkoop Street
                                      Denver, Colorado 80202-1129

As to EPA by email:                   Patefield.Scott@epa.gov
                                      Portmess.Jessica@epa.gov

As to the State of Colorado by email: tom.roan@coag.gov
                                      david.beckstrom@coag.gov

As to the State of Colorado:          First Assistant Attorney General Air Quality Unit
                                      Natural Resources Section
                                      Colorado Attorney General's Office
                                      1300 Broadway, 7th Floor
                                      Denver, CO  80203

As to CDPHE by email:                 shannon.mcmillan@state.co.us
                                      jennifer.mattox@state.co.us
                                      rebecca.wilson@state.co.us

As to CDPHE:                          Compliance & Enforcement Program Manager
                                      Colorado Department of Public Health and
                                      Environment
                                      Air Pollution Control Division
                                      APCD – SSP – B1
                                      4300 Cherry Creek Drive South
                                      Denver, CO  80246-1530

As to DCP by mail:                    DCP Operating Company, LP
                                      Attn: George R. Green, Group Vice President and
                                      General Counsel
                                      6900 E. Layton, Ave, Suite 900
                                      Denver, CO 80237-3658

As to DCP by email:                GRGreen@dcpmidstream.com

86.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

87.    Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XVI.    EFFECTIVE DATE

88.    The Effective Date of this Consent Decree shall be the date upon which approval of the Consent Decree is recorded on the Court's docket.

## XVII.    RETENTION OF JURISDICTION

89.    The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections XI and XVIII, or effectuating or enforcing compliance with the terms of this Decree.

## XVIII.    MODIFICATION

90.    This Consent Decree contains the entire agreement of the Parties and shall not be modified by a prior oral or written agreement, representation, or understanding.  Nonmaterial modifications to this Consent Decree, including any attached appendices, may be made by a subsequent written agreement and shall be effective when signed by all the Parties.  The United States may file non-material modifications with the Court on a periodic basis.  Where the modification constitutes a material modification to this Decree, the material modification shall be effective only upon approval by the Court.

91.    The Parties acknowledge that on November 15, 2021, EPA proposed new rules at

86 Federal Register 63,110–63,263 titled "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review." To the extent that these standards, if finalized, or any other standards promulgated prior to Termination under Section XIX affect DCP's compliance with this Consent Decree, the Parties acknowledge and agree that a modification of this Consent Decree may be necessary.  Any such modification will be subject to this Section XVIII.

92.    Any disputes concerning modification of this Decree shall be resolved pursuant to Section XI (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 71, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XIX.    TERMINATION

93.    At such time that DCP believes it has completed the following requirements, DCP may send the United States and State a Request for Termination of this Consent Decree, which DCP shall certify in accordance with Section VIII (Reporting Requirements), stating that DCP has satisfied those requirements:

a.    Completed the requirements of Section V (Compliance Requirements);

b.    Completed all requirements of Section VII (Environmental Mitigation Project);

c.    Completed the third LDAR Audit and the LDAR Audit for Bighorn required pursuant to Paragraph 30 (LDAR Audits);

d.    Paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree; and

e.     Applied for and received the applicable non-Title V permits for the Covered Facilities in accordance with Section VI (Incorporation of Consent Decree Requirements into Federally Enforceable Permits).

f.     Applied for modification, amendment, or revision to the applicable Title V permits for the Covered Facilities in accordance with Section VI (Incorporation of Consent Decree Requirements into Federally Enforceable Permits).

g.     Paid all applicable permitting fees due (including but not limited to Title V or NSR permits) for Covered Facilities.

94.    In the Request for Termination, DCP must demonstrate that it has maintained satisfactory compliance with this Consent Decree for the one-year period immediately preceding the Request for Termination.  The Request for Termination must be accompanied by a back-up copy of the LDAR Database for each Covered Facility and any other necessary supporting documentation.

95.    Following receipt by the United States and State of DCP's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether DCP has satisfactorily complied with the requirements for termination of this Consent Decree.  If the United States, after consultation with the State, agree that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

96.    If the United States, after consultation with the State, does not agree that the Decree may be terminated, DCP may invoke Dispute Resolution under Section XI of this Decree. However, DCP shall not seek Dispute Resolution of any dispute regarding termination until 45 Days after service of its Request for Termination.

## XX.     PUBLIC PARTICIPATION

97.    This Consent Decree shall be lodged with the Court for a period of not less than 30

Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United States

reserves the right to withdraw or withhold its consent if the comments regarding the Consent

Decree disclose facts or considerations indicating that the Consent Decree is inappropriate,

improper, or inadequate.  DCP consents to entry of this Consent Decree without further notice

and agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to

challenge any provision of the Decree, unless the United States has notified DCP in writing that

it no longer supports entry of the Decree.

## XXI.     SIGNATORIES/SERVICE

98.    Each undersigned representative of DCP, the State of Colorado, and the Assistant

Attorney General for the Environment and Natural Resources Division of the Department of

Justice certifies that he or she is fully authorized to enter into the terms and conditions of this

Consent Decree and to execute and legally bind the Party he or she represents to this document.

99.    This Consent Decree may be signed in counterparts, and its validity shall not be

challenged on that basis.  DCP agrees to accept service of process by mail with respect to all

matters arising under or relating to this Consent Decree and to waive the formal service

requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any

applicable Local Rules of this Court including, but not limited to, service of a summons.  DCP

need not file an answer to the complaint in this action unless or until the Court expressly declines

to approve this Consent Decree.

## XXII.     INTEGRATION

100.  This Consent Decree and its Appendices constitute the final, complete, and

exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersede all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  Other than deliverables that are subsequently submitted and approved pursuant to this Decree, the Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

<h2 style="text-align:center">XXIII.    26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION</h2>

101.  For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section II (Applicability), Paragraph 8; Section V (Compliance Requirements), Paragraphs 16–34; Section VI (Incorporation of Consent Decree Requirements into Federally Enforceable Permits), Paragraphs 35–36; Section VII (Environmental Mitigation Project), Paragraphs 33 and 37– 39; Section VIII (Reporting Requirements), Paragraphs 40–43 and 46; and Section XII (Information Collection and Retention), Paragraphs 73–74 is restitution or required to come into compliance with law.

<h2 style="text-align:center">XXIV.    FINAL JUDGMENT</h2>

102.  Upon approval of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States, the State of Colorado, and DCP.

Dated and entered this _____ Day of _____ 20_____

_____
UNITED STATES DISTRICT JUDGE
District of Colorado

THE UNDERSIGNED PARTY enters into this Consent Decree in this action captioned United States and the State of Colorado v. DCP Operating Company, LP et al.

**FOR THE UNITED STATES OF AMERICA:**


TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice


7/22/22
Date

DEVON A. AHEARN
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice

THE UNDERSIGNED PARTY enters into this Consent Decree in this action captioned United States and the State of Colorado v. DCP Operating Company, LP et al.

**FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

LAWRENCE STARFIELD

Digitally signed by LAWRENCE STARFIELD
Date: 2022.07.12 13:42:53 -04'00'

_____
LAWRENCE E. STARFIELD
Acting Assistant Administrator
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue
Washington, D.C. 20460

ROSEMARIE KELLEY

Digitally signed by ROSEMARIE KELLEY
Date: 2022.07.12 12:11:02 -04'00'

_____
ROSEMARIE A. KELLEY
Director, Office of Civil Enforcement
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

Greene, Mary E

Digitally signed by Greene, Mary E
Date: 2022.07.11 11:14:12 -04'00'

_____
MARY E. GREENE
Director, Air Enforcement Division
Office of Civil Enforcement
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

SABRINA ARGENTIERI

Digitally signed by SABRINA ARGENTIERI
Date: 2022.07.11 11:52:37 -04'00'

_____
SABRINA ARGENTIERI
Attorney Advisor, Air Enforcement Division
Office of Civil Enforcement
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

THE UNDERSIGNED PARTY enters into this Consent Decree in this action captioned United States and the State of Colorado v. DCP Operating Company, LP et al.

**FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY, REGION 8**:

KATHLEEN BECKER
Digitally signed by
KATHLEEN BECKER
Date: 2022.06.26
13:49:38 -06'00'

_____
Date

KC BECKER
Regional Administrator
U.S. Environmental Protection Agency, Region 8

KENNETH SCHEFSKI
Digitally signed by
KENNETH SCHEFSKI
Date: 2022.06.21
09:53:55 -06'00'

_____
Date

KENNETH C. SCHEFSKI
Regional Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency, Region 8

SUZANNE BOHAN
Digitally signed by
SUZANNE BOHAN
Date: 2022.06.21
08:34:33 -06'00'

_____
Date

SUZANNE J. BOHAN
Division Director, Enforcement and Compliance Assurance Division
U.S. Environmental Protection Agency, Region 8

JESSICA PORTMESS
Digitally signed by
JESSICA PORTMESS
Date: 2022.06.17
08:31:45 -06'00'

_____
Date

JESSICA PORTMESS
Senior Assistant Regional Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency, Region 8

THE UNDERSIGNED PARTY enters into this Consent Decree in this action captioned United States and the State of Colorado v. DCP Operating Company, LP et al.

**FOR THE STATE OF COLORADO**:


Date: 6/15/2022

MICHAEL OGLETREE
Director
Air Pollution Control Division
Colorado Department of Public Health and Environment



PHILIP WEISER
Attorney General
State of Colorado


Date: 6/24/2022

DAVID BECKSTROM
Assistant Attorney General
Natural Resources and Environmental Section
Colorado Department of Law

THE UNDERSIGNED PARTY enters into this Consent Decree in this action captioned United States and the State of Colorado v. DCP Operating Company, LP et al.

**FOR DCP**:


6/13/2022
Date

WILLIAM L. JOHNSON
President
DCP Operating Company, LP

**APPENDIX**

The following Appendix is attached to and part of this Consent Decree:

"Appendix A" is the Factors to be Considered and Procedures to be Followed to Claim Commercial Unavailability.

## APPENDIX A

## Factors to be Considered and Procedures to be Followed
## to Claim Commercial Unavailability

This Appendix outlines the factors to be taken into consideration and the procedures to be followed for DCP to assert that a certified Low-Emissions Valve or a valve that utilizes certified Low-Emissions Packing is "commercially unavailable" pursuant to Paragraph 25.h of the Consent Decree.

## I.    FACTORS FOR DETERMINING COMMERCIAL UNAVAILABILITY

A.    Nothing in this Consent Decree or this Appendix requires DCP to utilize any valve or packing that is not suitable for its intended use in a Covered Process Unit.

B.    The following factors are relevant in determining whether a certified Low-Emissions Valve or a valve that utilizes certified Low-Emissions Packing is commercially unavailable to replace or repack an Existing Covered Valve:

1.    Valve type (e.g., ball, gate, butterfly, needle) (neither the Consent Decree nor this Appendix requires consideration of a different type of valve than the type that is being replaced);

2.    Nominal valve size (e.g., 2 inches, 4 inches);

3.    Compatibility of materials of construction with process chemistry and product quality requirements;

4.    Valve operating conditions (e.g., temperature, pressure);

5.    Service life;

6.    Packing friction (e.g., impact on operability of valve);

7.    Whether the valve is part of a packaged system;

8.    Retrofit requirements (e.g., re-piping or space limitations);

9.    Other relevant considerations

C.    The following factors may also be relevant, depending upon the Process Unit or equipment where the valve is located:

1. In cases where the valve is a component of equipment that DCP is licensing or leasing from a third party, valve or valve packing specifications identified by the lessor or licensor of the equipment of which the valve is a component;

2. Valve or valve packing vendor or manufacturer recommendations for the relevant Process Unit components.

**II.    PROCEDURES FOR ASSERTING COMMERCIAL UNAVAILABILITY:** DCP shall comply with the following procedures if it seeks to assert commercial unavailability under Paragraph 25.h of the Consent Decree:

A.    DCP must contact a reasonable number of vendors of valves or valve packing that DCP, in good faith, believes may have valves or valve packing suitable for the intended use, taking into account the relevant factors listed in Section I of this Appendix.

1. For purposes of this Consent Decree, a reasonable number of vendors presumptively shall mean no less than three.

2. If fewer than three vendors are contacted, the determination of whether such fewer number is reasonable shall be based on Factors set forth in Section I.C., above, or on a demonstration that fewer than three vendors offer valves or valve packing considering Factors set forth in Section I.B., above.

B.    DCP shall obtain a written representation from each vendor, or equivalent documentation, that a particular valve or valve packing is not available as "Low-Emissions" from that vendor for the intended conditions or use.

1. "Equivalent documentation" may include e-mail or other correspondence or data showing that a valve or valve packing suitable for the intended use does not meet the definition of Low-Emissions Valve or Low-Emissions Packing in the Consent Decree or that the valve or packing is not suitable for the intended use.

2. If a vendor does not respond or refuses to provide a written representation or equivalent documentation, "equivalent documentation" may consist of records of DCP's attempts to obtain a response from such vendor.

C.    Each status report required by Paragraph 40 of the Consent Decree shall identify each instance when a Low-Emissions Valve or a valve that utilizes Low-Emissions Packing was not commercially available. DCP shall provide a complete explanation of the basis for its claim of commercial unavailability, including, as an attachment to the status report, all relevant documentation. This report shall be valid for a period of 365 Days from the date of the report for the specific valve involved and all other similar valves, taking into account the factors listed in Section I.

93